UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GLENN ROUTHIER,

                        Plaintiff,

        v.                                              C.A. No.:  05-10856-GAO

PLYMOUTH ROCK TRANSPORTATION
CORPORATION,

                        Defendant.

**DEFENDANT PLYMOUTH ROCK TRANSPORTATION CORPORATION'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

## I.      INTRODUCTION

        Plaintiff Glenn Routhier's complaint against defendant Plymouth Rock Transportation

Corporation ("Plymouth Rock") should be dismissed because his claim for constructive

discharge is preempted by the Labor Management Relations Act ("LMRA"), he failed to exhaust

the administrative remedies available to him under the relevant collective bargaining agreement,

and his claims are time-barred under the LMRA.

        Routhier, a former dock worker for Plymouth Rock, was a member of the International

Brotherhood of Teamsters ("the Union").  A collective bargaining agreement between Plymouth

Rock and the Union governed the terms and conditions of Routhier's employment.  In this

action, Routhier alleges that Plymouth Rock denied him seniority rights under the collective

bargaining agreement and that he was constructively discharged because he was denied those

rights.  Routhier resigned from Plymouth Rock on August 18, 2001.  He did not file his state

court complaint until August 18, 2004, or his federal court complaint until April 28, 2005.

Because Routhier's claim for constructive discharge depends on an interpretation of the collective bargaining agreement, his claim is preempted by the LMRA.  Further, Routhier failed to exhaust the administrative remedies available to him under the collective bargaining agreement.  Finally, Routhier's claims are time-barred because he failed to file his complaint within the six-month statute of limitations period of the LMRA.  Accordingly, the Court should dismiss Routhier's complaint in its entirety.

## II.    BACKGROUND

### A.    Factual Background[1]

In November 1998, Plymouth Rock hired Routhier as a dock worker.  Complaint ("Compl.") ¶ 5.  As a condition of his employment with Plymouth Rock, Routhier became a member of the Union.  Compl. ¶ 7.

A collective bargaining agreement between Plymouth Rock and the Union ("the Agreement") set forth the terms and conditions of employment for all bargaining unit members, including Routhier.  *See* Compl. ¶ 10; Agreement (Exhibit A).[2]  Article 43 of the Agreement addresses seniority and certain job benefits.  *See* Compl. ¶¶ 8-9; Agreement (Article 43).  All disputes concerning the seniority provisions set forth in Article 43 are subject to a grievance

---

[1] For purposes of Plymouth Rock's motion to dismiss for failure to state a claim under Rule 12(b)(6), the facts alleged in the complaint are assumed to be true.  *See Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 16 (1st Cir. 1998).

[2] Routhier's complaint specifically refers to "the collective bargaining agreement."  *See* Compl. ¶¶ 22, 27.  The civil action cover sheet describes this action as the alleged "failure of [Plymouth Rock] to abide by [the] collective bargaining agreement."  *See* Civil Action Cover Sheet.  The complaint also refers to "Union and Plymouth Rock policies" and the "union contract" governing, among other things, a "seniority list."  Compl. ¶¶ 10-13, 15.  Seniority rights are governed by Article 43 of the Agreement.  Consequently, the Court may consider the Agreement under this Rule 12(b)(6) motion to dismiss.  *See Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) ("When a complaint relies upon a document, whose authenticity is not challenged, such a document 'mergers into the pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss."); *Beddall*, 137 F.3d at 16-17 (concluding that where a document is sufficiently referred to in complaint, a motion to dismiss is not converted to a motion for summary judgment).

procedure.  Agreement (Article 43, Section 2(h); Article 46).[3]  Likewise, all disputes concerning termination of employment are subject to the Agreement's grievance procedures.  Agreement (Article 47).  The grievance provision sets forth the process for filing and appealing grievances.  Agreement (Article 46, Section 1).  The Agreement further states that "the Union and [Plymouth Rock] agree that there shall be no . . . legal proceedings without first using all possible means of a settlement, as provided for in this Agreement, of any controversy which might arise."  Agreement (Article 46, Section 1).

As a Union member subject to the Agreement, Routhier was eligible for certain seniority list rights.  Compl. ¶ 10.  He alleges that Plymouth Rock denied him the opportunity to be placed on the seniority list because he did not have a Class A truck driver's license.  Compl. ¶ 14.  Although the Union steward "advised [company officials] of [Routhier's] eligibility for the seniority list," Routhier was denied seniority list status.  Compl. ¶¶ 13-14.  Routhier did not file a grievance concerning the alleged failure to include him on the seniority list.  Routhier contends that Plymouth Rock's failure to place him on the seniority list made working conditions so intolerable that he was forced to resign.  Compl. ¶ 36.  On August 18, 2001, Routhier resigned from Plymouth Rock.  Compl. ¶ 20.

### B.     Procedural Background

On August 18, 2004, Routhier filed a complaint in Massachusetts Superior Court (Middlesex County).  *See* Affidavit of David J. Santeusanio (Attaching Massachusetts Civil Docket Sheet) (Exhibit B).  Routhier alleged that Plymouth Rock's failure to place him on the seniority list forced him to resign, and he asserted a single claim for constructive discharge.

---

[3] Article 43, section 2(h), provides that "[i]f a dispute arises concerning the interpretation or application of the foregoing provisions dealing with seniority, then the subject matter of such dispute may be taken up by the aggrieved party with the Joint Area Committee provided for herein."  Article 46 describes the grievance process, including the role of the Joint Area Committee.

Plymouth Rock moved to dismiss this claim on the grounds that it was preempted by the LMRA

and that he failed to exhaust his administrative remedies.  In his opposition, Routhier argued,

among other things, that if his claim for constructive discharge was preempted by the LMRA, he

should be permitted leave of court to "remove" his complaint to federal court.  On January 20,

2005, the Massachusetts Superior Court (Hines, J.) issued an order stating "no action taken [on

defendant's motion] as plaintiff is granted leave to remove this case to the U.S. District Court for

District of Mass." *Id.*  On April 28, 2005, Routhier filed a complaint in federal court asserting

two claims:  constructive discharge and violation of the LMRA.  Compl. ¶¶ 21-37.

III.    **ARGUMENT**

    A.    **This Court Should Dismiss Routhier's Constructive Discharge Claim
          Because it is Preempted by the LMRA**

        Routhier's constructive discharge claim against Plymouth Rock is preempted by

Section 301 of the LMRA.  Section 301 provides that the federal courts have jurisdiction over

"[s]uits for violation of contracts between an employer and a labor organization representing

employees in an industry affecting commerce . . . , or between any such labor organizations."

29 U.S.C. § 185(a).  Section 301 "completely preempts a state law claim if the resolution of the

claim necessitates analysis of, or substantially depends on the meaning of, a collective

bargaining agreement."  *Quesnel v. Prudential Ins. Co.*, 66 F.3d 8, 10 (1st Cir. 1995).  A state

law claim is preempted by Section 301 as long as evaluation of that claim "is inextricably

intertwined with consideration of the terms of the labor contract."  *Allis-Chalmers Corp. v.

Lueck,* 471 U.S. 202, 213 (1985).  A state law claim involving an analysis of seniority rights is

subject to Section 301 preemption because seniority rights necessarily arise out of a collective

bargaining agreement.  *See Lydon v. Boston Sand & Gravel Co.*, 15 F. Supp. 2d 150, 155 (D.

Mass. 1998) (dismissing state law claim on Section 301 preemption grounds because "any rights

plaintiff has in seniority is directly tied to the terms of the labor agreement between defendant and the union representing plaintiff").

Routhier claims he was constructively discharged because he was denied seniority list rights to which he was entitled under the Agreement. Compl. ¶ 20. To determine whether Routhier could prevail on his claim, a court would need to analyze, among other things, (1) whether Routhier was eligible to be placed on the seniority list under the Agreement; (2) whether Plymouth Rock violated the Agreement by failing to add him to the seniority list; (3) whether Plymouth Rock denied him any rights under the Agreement; (4) whether Plymouth Rock's alleged violation of the Agreement made the conditions of Routhier's employment "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign;" and (5) whether such alleged constructive discharge constitutes a wrongful termination under the Agreement. *See generally GTE Products Corp. v. Stewart*, 421 Mass. 22, 34-35 (1995) (discussing general constructive discharge standard). In short, a court could not rule on the merits of Routhier's constructive discharge claim without first analyzing the terms of the Agreement. Because Routhier's constructive discharge claim is "inextricably intertwined" with the terms of a collective bargaining agreement, it is preempted by Section 301 and must be dismissed.

**B.    Routhier's Claims Against Plymouth Rock Must Be Dismissed Because He Failed To Exhaust The Remedies Available to Him Under The Agreement**

Routhier's claims for constructive discharge and the LMRA must also be dismissed because Routhier failed to exhaust the remedies available to him under the terms of the Agreement. Section 301 claims are "subject to the requirement of exhaustion of the grievance procedures provided for in the collective bargaining agreement." *Magerer v. John Sexton & Co.*, 912 F.2d 525, 531 (1st Cir. 1990) (affirming dismissal on 12(b)(6) motion of preempted claims

for failure to exhaust administrative remedies); *see Voda v. New England Tel. & Tel. Co.*, 580 F. Supp. 852, 854 (D. Mass. 1984) (dismissing claims on 12(b)(6) motion where plaintiff's efforts "did not amount to a bona fide attempt to exhaust her administrative remedies"); *Melanson v. John J. Duane Co.*, 507 F. Supp. 238, 240-41 (D. Mass 1980) (dismissing plaintiff's claims against employer for breach of contract because he failed to exhaust administrative remedies). To permit an employee to avoid the available grievance procedures "would deprive [the] employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances" and would "disrupt [ ] . . . the negotiation and administration of collective agreements." *See Republic Steel Corp. v. Maddox*, 379 U.S. 650, 653 (1965); *see also Allis-Chalmers*, 471 U.S. at 220 ("[a] rule that permitted an individual to sidestep available grievance procedures would cause arbitration to lose most of its effectiveness . . . and eviscerate a central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance").

Here, the Agreement provided for administrative remedies to address, among other things, violations of the seniority provision and termination of employment (*e.g.*, constructive discharge). *See* Agreement (Article 43, Section 2(h); Article 46; Article 47). Routhier alleges that the Union steward "advised [company officials] of [Routhier's] eligibility for the seniority list." Compl. ¶ 13. Routhier, however, failed to file a grievance and failed to pursue, through the Union, the administrative remedies available under the Agreement. Therefore, Routhier's claims against Plymouth Rock must be dismissed.

### C.     Routhier's Complaint is Barred by the LMRA's Statute of Limitations

Routhier's claims of constructive discharge and violation of the LMRA are subject to the LMRA's six-month statute of limitations period and should be dismissed.  *See* 29 U.S.C. § 160(b); *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 172 (1983) (applying six-month statute of limitations to section 301 claim against union and employers); *Communications Workers of America, AFL-CIO v. Western Elec. Co.*, 860 F.2d 1137, 1145 (1st Cir. 1988) (applying six-month statute of limitations period to section 301 claim); *Kneeland v. Pepsi Cola Metro. Co.*, 605 F. Supp. 137, 139 (D. Mass. 1985) (concluding plaintiff's wrongful discharge claim was barred by six-month statute of limitations period of LMRA); *Voda*, 580 F. Supp. at 854 (same).  Here, Routhier resigned from Plymouth Rock on August 18, 2001. Compl. ¶ 20.  Routhier did not file his state court complaint until August 18, 2004, or his federal court complaint until April 28, 2005.  Accordingly, his claims are time-barred under the six-month statute of limitations period of the LMRA.

**IV.    CONCLUSION**

For the reasons set forth above, Plymouth Rock respectfully requests that the Court dismiss Routhier's complaint under Rule 12(b)(6).

Respectfully submitted,

PLYMOUTH ROCK TRANSPORTATION CORPORATION

By its attorneys,

HOLLAND & KNIGHT LLP


*/s/ David J. Santeusanio*
Liam T. O'Connell (BBO # 558249)
David J. Santeusanio (BBO # 641270)
10 St. James Avenue
Boston, Massachusetts 02116
(617) 523-2700

Dated:  July 19, 2005

DISTRICT OF MASSACHUSETTS

CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2005, I electronically filed the Defendant's Memorandum of Law in Support of its Motion to Dismiss using the CM/EMF system, which will send notification of such filing to the following attorney of record:

Mary Notaris
45 Stiles Road, Suite 104
Salem, New Hampshire 03079

*/s/ David J. Santeusanio*
Holland & Knight LLP
10 St. James Avenue
Boston, Massachusetts 02116

# EXHIBIT A

# NATIONAL MASTER FREIGHT AGREEMENT AND NEW ENGLAND SUPPLEMENTAL AGREEMENT



## For the Period:
## April 1, 1998 through March 31, 2003





# New England Supplemental Agreement

For the Period of
April 1, 1998
Through
March 31, 2003

in

## CONNECTICUT  MASSACHUSETTS

## RHODE ISLAND

Local Unions:
25, 59, 170, 191, 251, 404, 437, 443,
493, 653, 671, and 677

# NEW ENGLAND SUPPLEMENTAL

# FREIGHT AGREEMENT

## For the Period:

## Beginning April 1, 1998

## And Ending March 31, 2003

## in

## CONNECTICUT  MASSACHUSETTS

## RHODE ISLAND

The _____ hereinafter
referred to as the EMPLOYER, (Company)

and

LOCAL UNION No._____ , affiliated with the INTERNATION-
AL BROTHERHOOD OF TEAMSTERS, hereinafter referred to as the
UNION, agree to be bound by the terms and provisions of this
Agreement.

This Supplemental Agreement is supplemental to and becomes a
part of the Master Freight Agreement, hereinafter referred to as the
"Master Agreement" for the period commencing April 1, 1998, which
Master Agreement shall prevail over the provisions of this Supplement
in any case of conflict between the two, except as such Master
Agreement may specifically permit. Questions arising out of alleged
conflicts shall be submitted directly to the National Grievance
Committee.

**163**

# ARTICLE 40 - SCOPE OF AGREEMENT

## Section 1. Operations Covered

The execution of this Supplemental Agreement on the part of the Employer shall cover all over-the-road and local operations of the Employer within, into and out of the area and territory described above.

All operations and work covered herein shall be performed exclusively by employees covered by this Agreement.

## Section 2. Employees Covered

(a) Employees covered by this Agreement shall be construed to mean, but not limited to, any driver, chauffeur or driver helper operating a truck, tractor, motorcycle, passenger or horsedrawn vehicle, or any other vehicle operated on the highways, street or private road, for transportation purposes when used to defeat the purpose of this Agreement. The term employees also includes, but is not limited to, all employees used in dock work, switching, checking, drag lines, stacking, loading, unloading, handling, shipping, receiving and assembling.

(b) Over-the-road employees shall be any driver, chauffeur, or driver-helper operating a truck or tractor, or any other vehicle, for line haul transportation purposes, between the terminal areas and overhead drivers as defined herein.

(c) Rigging work covered by this Agreement shall be any work in which the trucks, tools and equipment of the Employer, such as chain falls, cable or rope falls, rolls, jacks, blocking, dollies, steel and wood skids and any other equipment, including mobile cranes, winches, fork lift trucks and all other power units, are used by the Employer in the rigging craft, and further including the loading and unloading of materials at railroads and all other shipping and receiving facilities.

(d) Supervisory personnel of the Employer shall be restricted from performing the work which is recognized as the work of employees covered by this Agreement except as otherwise provided in this Agreement.

(e) In the event that any Employer signatory to this Agreement puts

**164**

into effect a freight operation requiring the use of a helicopter pilot, co-pilot and/or ground crews, it is hereby agreed to and recognized that such employees shall be included as employees within the scope of this bargaining unit.

## Section 3. Notice of Opening and Closing Terminals

If the Employer contemplates opening or closing any terminals within the jurisdiction of the twelve (12) Local Unions listed on the title page hereof, he shall notify the Local Unions at least thirty (30) days prior to making such change.

## Section 4. Hired or Leased Equipment

In all cases hired or leased equipment shall be operated by a bargaining unit employee of the Employer. The Employer expressly reserves the right to control the manner, means and details of, and by which the owner-operator performs his service, as well as the ends to be accomplished.

## ARTICLE 41 - STEWARDS - APPOINTMENTS AND DUTIES

The Employer recognizes the right of the Union to designate job stewards and alternates for each terminal from the Employer's seniority list, but no more than one in each classification. The authority of job stewards and alternates so designated by the Union shall be limited to, and shall not exceed the following duties and activities:

1. The investigation and presentation of grievances to his Employer, or the designated company representative in accordance with the provisions of this collective bargaining agreement;

2. The collection of dues when authorized by appropriate Local Union official;

3. The transmission of such messages and information which shall originate with, and are authorized by the Local Union or its officers, provided such messages and information:

(a) have been reduced to writing, or

**165**

(b) if not reduced to writing, are of a routine nature and do not involve work stoppages, slow-downs or refusals to handle goods.

(c) Failure on the part of the Employer to allow stewards sufficient time to perform his or her duties as outlined above or harassment by either party, shall be subject to the grievance machinery.

Job stewards and alternates have no authority to take strike action, cause a slowdown or any other action interrupting the Employer's business, except as authorized by official action of the Union. The Employer recognizes these limitations upon the authority of job stewards and their alternates, and shall not hold the Union liable for any unauthorized acts. The Employer in so recognizing such limitations shall have the authority to impose proper discipline, including discharge, in the event the shop steward has taken unauthorized strike action, or work stoppage in violation of this Agreement. The Union reserves the right to remove the Shop Steward at any time, for the good of the Union.

The Union Steward shall be accorded Super Seniority with respect to terms and conditions of employment for layoff and recall purposes only, and in other situations that assure the Steward greater accessibility to co-workers to genuinely assist him to perform his functions as a Steward which will be to the benefit of co-workers.

NOTE: This Article supersedes the Stewards' Article in the National Master Freight Agreement.

# ARTICLE 42 - ABSENCE

## Section 1. Time Off for Union Activities

The Employer agrees to grant the necessary and reasonable time off, without discrimination or loss of seniority rights and without pay, to any employee designated by the Union to attend a labor convention or serve in any capacity or other official Union business, provided forty-eight (48) hours' written notice is given to the Employer by the Union, specifying length of time off. The Union agrees that, in making its request for time off for Union activities, due consideration shall be given to the number of men affected in order that there shall be no disruption of the Employer's operation due to lack of available employees.

## Section 2. Leave of Absence

Any employee desiring leave of absence from his employment shall secure written permission from both the Local Union and Employer. The maximum leave of absence shall be for thirty (30) days and may be extended for like periods. Permission for extension must be secured from both the Local Union and Employer in writing. During the period of absence, the employee shall not engage in gainful employment. Failure to comply with this provision shall result in the complete loss of seniority rights for the employees involved. Inability to work because of proven sickness or injury shall not result in the loss of seniority rights.

# ARTICLE 43 - SENIORITY

## Section 1.

(a) Seniority for employees governed by this Agreement shall be defined as the period of employment with the Employer in the work covered by this Agreement, at the terminal (or terminals) within the jurisdiction of the Local Union(s). It shall be deemed to include any seniority presently held by an employee through agreement between the Employer and the Local Union prior to this Agreement. Where the current practice of a Master Seniority List exists, it will continue in effect for the duration of this Agreement.

## Probationary Employees

(b) (1) All new employees shall be hired on a thirty (30) calendar days' trial basis and shall work under the provisions of this Agreement, within which time they may be dismissed without protest by the Union. However, the Employer may not discharge or discipline for the purpose of evading this Agreement or discriminating against Union members. After thirty (30) days' trial period they shall be placed on the seniority list as regular employees in accordance with their date of hire, provided, however, that an employee must work a minimum of ninety-six (96) hours during his thirty days' trial period.

In case of discipline within the thirty (30) day period, the Employer shall notify the Local Union in writing.

**167**

(2) During the probationary period, the employee may be terminated without further recourse; provided, however, that the Employer may not terminate the employee for the purpose of evading the Agreement or discriminating against Union members. A probationary employee who is terminated by the Employer during the probationary period and is then worked again at any time during the next full twelve months at any of that Employer's locations within the jurisdiction of the Local Union covering the terminal where he first worked, except in those jurisdictions where the Local Union maintains a hiring hall or referral system, shall be added to the regular seniority list with a seniority date as of the date that person is subsequently worked.

(3) Probationary employees shall be paid at the new hire rate of pay during the probationary period; however, if the employee is terminated by the Employer during such period, he shall be compensated at the full contract rate of pay for all hours worked retroactive to the first day worked in such period.

All new employees (probationary, casual, etc.) shall start only on established starting times on the working schedule except as a replacement for absenteeism or sickness or for the purpose of making pickups only.

An employee who so qualifies for seniority status shall have his seniority date revert back to his first day worked within the thirty (30) days probationary period.

## Casual Employees

(1) A casual employee is an individual who is not on the regular seniority list and who is not serving a probationary period. Casuals shall not have seniority status. Casuals shall not be discriminated against for future employment.

(2) When an Employer utilizes a casual employee for fifteen (15) days within a calendar month, excluding coverage for vacation vacancies (5/1-10/31), he shall begin his probationary status effective with his 16th day worked. He shall gain seniority status after having worked a minimum of ninety-six (96) hours within a thirty (30) calendar day period and having worked the first (1st) and thirtieth (30th) day of the thirty (30) calendar day period. His seniority date shall be the first (1st) day worked within that thirty (30) day pro-

bationary period.

(3) A monthly list of all extra (e.g., laid-off), casual (supplemental or replacement) and/or probationary employees used during that month shall be submitted to the Local Unions by the tenth (10th) day of the following month. Such list shall show:

(a)  The employee's name, address, and Social Security number;

(b)  The dates worked;

(c)  The classification of work performed each day, and the hours worked;

(d)  The name, if applicable, of the employee replaced. This list shall be compiled on a daily basis, and shall be available for inspection by a Union representative and/or shop steward.

## Regular Employees

(c)  Preference shall be given to regular employees older in service and in order of their seniority to the work available, provided that such employees are available at such time as the work is assigned and are qualified to perform the work required.

(d)  Regular employees in order of their seniority shall have preference:

(1) In selection of starting times and assignment from the working schedule.

(2) In filling of vacancies and job opportunities in the working schedule.

(3) To work opportunity in the event of layoff for lack of work.

(4) In recall to work after layoff.

(5) In selection of vacations from the vacation schedule.

(6) Seniority does not give an employee the right to choose any specific unit or load.

(e)  All jobs shall be bid at least on an annual basis, within thirty (30) days of the commencement of each contract year. A definite reporting time and working schedule covering all regular employees shall be established by the Employer and the Union. It being understood that no employee shall be required to work in excess of

**169**

ten (10) hours after returning from one tour of duty whether it be by driving or a combination of driving and dock work, provided the involved employee notifies his superior at the start of his work day, emergencies excluded. Current area practices shall continue with regard to break periods. There shall be no layoff to evade the provisions of this Agreement relating to scheduling and starting time. No change in any assignment or reporting time under the schedule, shall be made by the Employer without the consent of the Union. The schedule, when changed and agreed upon, shall be posted by the Employer on Monday to become effective the following Monday. The requirement of Union "consent" does not mean the Union may arbitrarily or capriciously refuse to recognize the Employer's need to operate an efficient business and in doing so recognize his need to increase or decrease the number of employees, which may necessitate the changing of schedules and starting time consistent with his business requirements.

The Employer and the Union may agree, subject to approval by the New England Supplemental Negotiating Committee, to have 4-10 hour bids, which shall be consecutive, Monday-Thursday or Tuesday-Friday.

All 4-10 hour bid employees shall be guaranteed a 40 hour week regardless of seniority. Employees working a 4-10 hour bid shall receive holiday pay equal to ten (10) hours. If required to work on a 5th day during any week, the employees shall be compensated at the time and one-half rate of pay for all hours worked. Any employee on the seniority list as of the employee effective date of this Agreement, shall not be forced on a 4-10 hour bid.

Any employee senior to a 4-10 hour bid man, not receiving more than three (3) days work in a week, due to layoff, may bump the most junior 4-10 hour bid man the following payroll period. Notification of intention to bump must be made known to the Employer no later than noon on Friday, preceding the next payroll period. It is understood that the employee that bumps into 4-10 hour bid must remain on said bid until such time as he is displaced by layoff or rebid.

(f) Regular employees in the order of their seniority shall have the right to select their reporting times and assignments from the schedule, and to hold such assignments unless displaced by a change in schedule or by layoff for lack of work.

**170**

(g) Sunday and Saturday work shall be apportioned among the regular employees in the manner determined by the Local Union and the Employer.

(h) An employee called to work before his regular scheduled report time shall not be required to take time off to compensate therefor.

(i) An Act of God may exist if severe weather conditions exist at a: terminal proper; within the general geographical area served by a Local Cartage terminal; or in the final leg of road operations so that the terminal(s) is not receiving freight in accordance with the normal schedule.

Conditions may vary from carrier to carrier and an Act of God situation may exist for one or more carriers and not others.

A terminal must declare an Act of God emergency uniformly by shift cancellations, until such time as the Act of God emergency is revoked.

Employees working while the Act of God is invoked are subject to the eight (8) hour guarantee.

Work opportunities during the Act of God emergency must be offered in seniority order providing the employee will protect his next regularly scheduled starting time once the Act of God has been canceled.

Upon revocation of the Act of God emergency employees will be recalled uniformly by shift or will report as scheduled at their assigned starting times.

An employee shall be notified of a layoff at the end of his tour of duty, except for an Act of God, fire or utility failure. In the event of layoff, the most junior employee shall be the first laid off and rehiring shall be in inverse order of seniority. Road drivers laid off during the week may bump into City Board only at the beginning of the next payroll period, and city employees laid off during the week may bump into the Road Board only at the beginning of the next payroll period. However, laid-off employees shall be entitled to extra work if available and qualified.

(j) In the event of a recall of an employee laid off, the laid-off employee shall be given notice, at least the night before (except for absenteeism or sickness on that day), or recall by telephone or telegram or personal contact, to the address last given the Employer by the

**171**

employee. Where work develops during the next day, the Employer shall, in the order of seniority of the laid-off men, make such work available by telephoning or telegram or personally contacting the employee at his home or such place as he shall have designated with the dispatcher as the place of contact. An employee recalled by the above procedure must notify the Employer as soon as possible in advance of the specified time for his report of his intention to report. In the event the employee fails to comply with the above provision he shall have no claim for work opportunity lost until he reports, but the Employer shall be responsible for the work opportunity lost if he shall fail to comply with these provisions. If an employee is recalled at a time other than his scheduled starting time (except as a replacement for absenteeism or sickness, or for the purpose of making pickups only) it must be at a starting time previously established on the working schedule.

## Section 2. Opening and/or Closing of Branches, Terminals, Divisions or Operations

(a) Opening New Branches, Terminals, Divisions or Operations

1. When a new branch, terminal, division or operation is opened (except as a replacement for existing operations or as a new division in a locality where there are existing operations), the Employer shall offer the opportunity to transfer to regular positions in the new branch, terminal, division or operations in the order of their company or classification seniority, to employees in those branches, terminals, divisions or operation which are affected in whole or in part by the opening of the new branch, terminal, division or operation. This provision is not intended to cover situations where there is replacement of an existing operation or where a new division is opened in a locality where there is an existing terminal. In these latter situations, laid-off employees in the existing facilities shall have first opportunity for employment at the new operation in accordance with their seniority. If all regular full-time positions are not filled in this manner, then the provisions of the above paragraph shall apply.

2. The transferred employees, other than those referred to in the exception to Section 1, above, shall, within the jurisdiction of this Supplemental Agreement, for a period of thirty (30) days following the transfer, have an unqualified right to return to their old branch,

**172**

terminal, division, or operation if it is still in existence and carry with them their seniority at that old branch, terminal, division, or operation. Employees who avail themselves of the transfer privileges because they are on layoff at their original terminal may exercise their seniority rights if work becomes available at the original terminal. Transferred employees shall have, after thirty (30) days, the same privileges with respect to subsequent transfers as set forth in paragraph 1 above.

(b) Closing of Branches, Terminals, Divisions or Operations

1. When a branch, terminal, division or operation is closed and the work of the branch, terminal, division or operation is eliminated an employee who was formerly employed at another branch, terminal, division or operation shall have the right to transfer back to such former branch, terminal, division or operation into which he is transferring provided he has not been away from such original terminal for more than two years.

2. When a branch, terminal, division or operation is closed or partially closed and the work at the branch, terminal, division or operation is transferred to another branch, terminal, division or operation in whole or in part, an employee at the closed or partially closed down branch, terminal, division or operation shall have the right to transfer to the branch, terminal, division or operation into which the work was transferred if regular work is there available.

(c) In the opening and/or closing of branches, terminals, divisions or operations, the provisions of the National Master Freight Agreement shall apply except that within the jurisdiction of this Supplemental Agreement an employee shall exercise his seniority on a Company basis in the affected branches, terminals, divisions or operations. It is further understood that those employees affected shall transfer to the branches, terminals, divisions or operations creating one master seniority list; and those employees lowest on the seniority list shall be laid off first.

(d) Classifications "Qualifications"

In all transfers referred to in Section 2 (a) and (b) above the employee must be qualified to perform the job by experience in the classifications.

(e) Merger

**173**

When two or more companies merge their operations then the employees of the respective companies shall all be placed on one seniority roster in the order of the earliest date of hire of each of the employees with their respective Employer.

(f) Acquisition or Purchase

When one Company acquires or purchases control of the business of another Company the seniority list shall be frozen on the date of signing the Agreement to purchase, including control by an ICC order. The employees of the Company so acquired or purchased shall be placed at the bottom of the acquiring or purchasing Company's seniority roster in the order of their payroll or Company seniority with the former Company. If the Employer requires additional men he shall give preference to the employees of the former Company for a period of 150 working days after the date of purchase, or duration of the contract, whichever is greater.

(g) Regulatory Agencies

The decision of the Interstate Commerce Commission or State Regulatory Body shall be considered as presumptive proof as to the nature of the transaction relative to mergers, purchases, acquisitions, and/or other combinations of two or more contract or common carriers.

(h) Dispute Procedures

If a dispute arises concerning the interpretation or application of the foregoing provisions dealing with seniority, then the subject matter of such dispute may be taken up by the aggrieved party with the Joint Area Committee provided for herein.

## Section 3. "House Concerns"

Where the Employer acquires or has acquired the work, or trucks of any so-called "House Concern" the employees of said concern shall be confined exclusively to the work they performed while in the employ of said concern. Those employees shall hold seniority on the work of said concern as if they were actually employed by said concern, in addition to maintaining a seniority standing on the Employer's seniority list from the day such employees started to work on the Employer's payroll. If, however, there is no work for said employees on the "House Concern's" work, the said employees shall

**174**

work, in their proper seniority as of the date of hire by the Employer on the Employer's work and shall be governed by the terms of this Agreement.

Past practices shall prevail as to when "House Concern" employees may exercise their company-earned seniority on jobs other than their "House Concern" job.

## Section 4. Loss of Seniority

(a) Seniority shall be broken only by:

1. Discharge

2. Voluntary Quit

3. Failure to respond to a notice of recall as specified in Section 1 (j) of this Article for regular work seven (7) consecutive days after receiving notice, or by mutual agreement.

4. Unauthorized leave of absence.

5. Unauthorized failure to report for work for three (3) consecutive days when working and on seniority list.

6. Retirement.

(b) Any employee who is absent because of proven illness or injury shall maintain his seniority.

## ARTICLE 44 - OTHER BUSINESS, ETC.

## Section 1. Other Business

During the term of this Agreement or any renewal thereof, the Employer shall not directly or indirectly operate, maintain or conduct any establishment or place of business, or cause any establishment or place of business to be operated or maintained or conducted where the effect thereof is to render the terms of this Agreement inapplicable for the purpose of evading the terms of this Agreement.

## Section 2. Extra Contract Agreements

The Employer agrees not to enter into any agreement or contracts

**175**

with his employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement shall be null and void.

## Section 3. New Equipment and/or Operations

If the Employer wishes to put into use any type of equipment and/or operations or jobs for which rates of pay are not established by this Agreement, such equipment, operations or job shall not be put into force until the use of such equipment, operation or job and the rate of pay shall have been established by the negotiating committees between the parties; provided, however, the Employer may put into use such equipment, operation or job on a trial basis with a tentative rate agreed upon in advance.

# ARTICLE 45 - GRIEVANCE MACHINERY COMMITTEE

## Section 1. New England Joint Area Committee

The Employers and the Unions shall together create a permanent New England Joint Area Committee, hereinafter referred to as the Joint Area Committee, composed of the following Local Unions: 25, 59, 170, 191, 251, 404, 437, 443, 493, 653, 671, and 677. The Joint Area Committee shall consist of an equal number appointed by Employers and Unions but no less than two (2) from each group. Each member may appoint an alternate in his place. The Joint Area Committee shall at its first meeting formulate rules of procedure to govern the conduct of its proceedings. The Joint Area Committee shall have jurisdiction over disputes and grievances involving Local Unions or complaints by Local Unions participating in such Committee. This Joint Area Committee shall meet at established times and at a mutually convenient location.

## Section 2. Eastern Region Joint Area Committee

The Employers and the Unions shall together create a permanent Eastern Region Joint Area Committee which shall consist of delegates from the Eastern Region Area. This Eastern Region Joint Area Committee shall meet at established times and at a mutually convenient location.

**176**

## Section 3. Contiguous Territory

If a dispute or grievance arising out of operations under this Agreement involves a Local Union situated in contiguous territory, such dispute or grievance shall be referred to the Joint Area Committee for handling by the Executive Secretary of the New England Joint Area Committee, and after such reference sh all be handled under the usual procedure of that Joint Area Committee.

## Section 4. Function of Committees

It shall be the function of the various committees, above referred-to, to settle disputes which cannot be settled between the Employer and Local Union in accordance with the procedures established herein. All committees established under this Article may act through subcommittees duly appointed by such committees.

## Section 5. Change of Terminals, etc.

Present terminals, breaking points, or domiciles shall not be transferred or changed without the Employer first having asked for and received approval from the appropriate Change of Operations Committee. This shall not apply within a twenty-five (25) mile radius, or within the jurisdiction of a Local Union. (Change of domicile for the purpose of having opposing labor and runs is not prohibited by this Section.)

## Section 6. Attendance

Meetings of all Committees above-referred-to must be attended by each member of such Committee or his alternates.

## Section 7. Examination of Records

The Local Union or the Joint Area Committee and Eastern Region Joint Area Committee shall have the right to examine time sheets and any other records pertaining to the computation of compensation of any individual or individuals whose pay is in dispute.

# ARTICLE 46 - GRIEVANCE MACHINERY AND UNION LIABILITY

## Section 1.

The Union and the Employers agree that there shall be no strike, lockout, tie-up, or legal proceedings without first using all possible means of a settlement, as provided for in this Agreement, of any controversy which might arise. Disputes shall first be taken up between the Employer and the Local Union involved. Failing adjustment by these parties, the following procedure shall then apply:

(a) All grievances involving the provisions of the New England Supplemental Freight Agreement shall be heard by the New England Joint Area Committee. Where the New England Joint Area Committee, by a majority vote, settles a dispute, no appeal may be taken to the Eastern Region Joint Area Committee. Such a decision will be final and binding on both parties.

(b) Where the New England Joint Area Committee is unable to agree or come to a decision on a case, it shall be submitted or appealed to the Eastern Region Joint Area Committee at the next regular constituted session, at the request of the Employer or Union involved, except as otherwise provided in (d) below. Where the Eastern Region Joint Area Committee, by a majority vote, settles a dispute, such decision shall be final and binding on both parties with no further appeal. Minutes of the New England Joint Area Committee shall set forth the position and facts relied on by each party, but each party may supplement such minutes at the hearing before the Eastern Region Joint Area Committee.

Cases deadlocked by the Eastern Region Joint Area Committee shall be referred to the National Grievance Committee unless otherwise provided for by Articles 7 and 8 of the National Master Freight Agreement. Otherwise, either party shall be permitted all legal or economic recourse.

(c) It is agreed that all matters pertaining to the interpretation of any provision of the New England Supplemental Freight Agreement may be referred by the Area Secretary for the Union and/or the Area Secretary for the Employers at the request of either the Employers or the Union, parties to the issue, with notice to the other Secretary,

**178**

to the New England Supplemental Freight Agreement Negotiating Committee for final interpretation.

(d) Deadlocked cases other than discharge cases may be submitted to umpire handling if a majority of the New England Joint Area Committee determines to submit such matter to an umpire for decision. Before any strike or stoppage of work takes place over a grievance or interpretation arising out of this contract that cannot be settled in accordance with the grievance machinery as set out in this Agreement, there must be approval by the Director of the Eastern Region of Teamsters or his designee with notice of such approval to be given to the Employer in writing. The granting of such approval by the Director of the Eastern Region of Teamsters or his designee shall not impose any liability on said Region. If a discharge case is deadlocked at the New England Joint Area level, it shall be submitted to an impartial umpire for handling. The Joint Area Committee shall attempt to agree on such umpire. If the Joint Area Committee cannot agree within ten (10) days after the deadlock, such umpire shall be selected from a panel of three submitted by the presiding judge of the Federal District Court. Selection of the umpire shall be made by the alternate striking of names within seventy-two (72) hours after the names are submitted to the parties. Hearing shall be held within ten (10) days thereafter. The decision of the umpire shall be final and binding. The fees and cost of the umpire shall be divided equally between the Employer and the Union involved.

(e) Failure of the Joint Committee to meet without fault of the complaining side, refusal of either party to submit to or appear at the grievance procedure at any stage, or failure to comply with any final decision withdraws the benefits of this Article.

(f) In the event of strikes, work-stoppages, or other activities which are permitted in case of deadlock, default, or failure to comply with majority decisions, no interpretation of this Agreement by any tribunal shall be binding upon the Union or affect the legality or lawfulness of the strike unless the Union stipulates to be bound by such interpretation, it being the intention of the parties to resolve all questions of interpretation by mutual agreement. Nothing herein shall prevent legal proceedings by the Employer where the strike is in violation of this Agreement.

(g) The procedures set forth herein may be invoked only by the

**179**

authorized Union representative or the Employer.

(h) Complaints must be in writing to the Secretary of the Area Board with a copy to the employer and in such form as prescribed by the Board. Except as otherwise provided in this Agreement and except for the payment for improper hourly or mileage rates, the Union on behalf of its members must file any claim for alleged violation of this Agreement not later than thirty (30) days after the alleged violations were made known to the employee. The Employer must file any claim for alleged violation of this Agreement not later than thirty (30) days after the alleged violation was made known to the Employer.

## Section 2.

It is further mutually agreed that the Local Union will, within two weeks of the date of the signing of this Agreement, serve upon the Company a written notice, which notice will list the Union's authorized representatives who will deal with the Company, make commitments for the Union generally, and in particular have the sole authority to act for the Union in calling or instituting strikes or any stoppages of work, and the Union shall not be liable for any activities unless so authorized. It is further agreed that in all cases of an unauthorized strike, slowdown, walk-out, or any unauthorized cessation of work in violation of this Agreement, the Union shall not be liable for damages resulting from such unauthorized acts of its members. While the Union shall undertake every reasonable means to induce such employees to return to their jobs during any such period of unauthorized stoppage of work mentioned above, it is specifically understood and agreed that the Company during the first twenty-four (24) hour period of such unauthorized work stoppage shall have the sole and complete right of reasonable discipline short of discharge, and such Union members shall not be entitled to or have any recourse to any other provisions of this Agreement.

After the first twenty-four (24) hour period of such stoppage and if such stoppage continues, however, the company shall have the sole and complete right to immediately discharge any Union member participating in any unauthorized strike, slowdown, walk-out, or any other cessation of work, and such Union members shall not be entitled to or have any recourse to any other provision of this Agreement. It is further agreed and understood that the Unions

**180**

shall not be liable for any strike, breach or default in violation of this Agreement unless the act is expressly authorized by its Executive Board. A properly designated officer of the Unions shall, within twenty-four (24) hours after request is made to the Executive Secretary of the Unions declare and advise the party making such request, by telegram, whether the Union has authorized any strike or stoppage of work. The Union shall make immediate effort to terminate any strike or stoppage of work which is not authorized by it without assuming liability therefor.

It is understood and agreed that failure of the Union to authorize a strike by a Local Union shall not relieve such Local Union of liability for a strike authorized by it and which is in violation of this Agreement.

## Section 3.

Notwithstanding anything herein contained, it is agreed that in the event any Employer is delinquent at the end of a period in the payment of his contribution to the Health and Welfare or Pension Fund or Funds, created under this Agreement in accordance with the rules and regulations of the Trustees of such Funds, after the proper official of the Local Union has given seventy-two (72) hours' notice to the Employer of such delinquency in Health and Welfare or Pension payments, the employees or their representatives shall have the right to take such action as may be necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employer shall be responsible to the employees for losses resulting therefrom.

## Section 4. National Grievance Committee

Grievances and questions of interpretation which are subject to handling under the provision of Article 8 of the National Agreement shall be promptly referred to the National Grievance Committee in accordance with such Article 8.

## ARTICLE 47 - DISCHARGE AND SUSPENSION

The Employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension shall give

**181**

at least one (1) warning notice of the complaint against such employee to the employee, in writing, and a copy of the same to the Union affected, except that no warning notice need be given to an employee before he is discharged if the cause of such discharge is dishonesty or drunkenness, or recklessness resulting in serious accident while on duty, or the carrying of unauthorized passengers, failure to report a known accident, or illegal drug induced intoxication as outlined in Article 35, Section 3 of the Master Agreement. The warning notice as herein provided shall not remain in effect for a period of more than nine (9) months from date of said warning notice. Discharge must be by proper written notice to the employee and the Union affected. Any employee may request an investigation as to his discharge or suspension. Should such investigation prove that an injustice has been done an employee, he shall be reinstated. The New England Joint Area Committee shall have the authority to order full, partial or no compensation for time lost. Appeal from discharge, suspension, or warning notice must be taken within ten (10) days by written notice, and a decision reached within thirty (30) days from the date of discharge, suspension or warning notice. If the employee involved is not within the home terminal area when the action of discharge, suspension or warning notice is taken, the ten (10) day period will start from the date of his return to the home terminal. If no decision has been rendered on the appeal within thirty (30) days the case shall then be taken up as provided for in Article 46 of this Agreement.

Any employee discharged away from his home terminal shall be provided the fastest available transportation to his home terminal at the Employer's expense.

The Local Union and the Employer agree all warning letters shall be considered as being automatically protested.

## ARTICLE 48 - PAYROLL PERIOD

The payroll period shall be run from Sunday to Saturday inclusive with pay day not later than Friday noon of the next week. Each employee shall be provided with a statement of gross earnings and an itemized statement of deductions made for any purpose each week. When the regular pay day occurs on a holiday or day celebrated as such, the Employer may pay the employees on the regu-

**182**

lar work day immediately preceding the holiday, but in no event later than Friday.

Regular employees scheduled on a Sunday start shall receive their pay by the end of their regularly scheduled work week.

## ARTICLE 49 - SUNDAYS AND HOLIDAYS

(a) (1) The following shall be recognized as paid holidays and all regular employees shall be paid eight hours' straight time pay therefor: New Year's Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Veteran's Day, Thanksgiving Day, the day after Thanksgiving Day, December 24th, and Christmas Day, irrespective of the dates on which the above-named holidays fall.

(2) In addition there shall be two (2) personal holidays which may be the Employee's Birthday or any other day mutually agreed to. It will be incumbent upon the employee to request such holidays from his Employer at least seven (7) days prior to said holiday. However, Road Drivers may elect to accept eight (8) hours' pay in lieu of such personal holiday. An employee after electing the holiday, or eight (8) hours pay in lieu of the holiday, shall have no recourse. All conditions in Article 49 relating to holidays shall apply, except that all regular employees hired after April 1, 1988, must work a minimum of ninety (90) days in order to qualify for the two (2) personal holidays.

(b) Regular employees shall be paid for each recognized holiday, or the day celebrated as such, irrespective of what day of the week the holiday falls, on the basis of eight (8) hours at their straight time rate, provided they work any day during the payroll period. Any regular employee laid off for lack of work shall not be deprived of his holiday pay if the layoff does not exceed thirty (30) days' duration. Regular employees required to work on any such days shall be paid the applicable premium rate in addition to the holiday pay.

(c) Probationary employees who work three (3) days during the payroll period in which a holiday occurs shall be paid for such holiday on the same basis as regular employees.

(d) The applicable minimum rate for work performed on Sundays or holidays, as such, shall be one and one-half (1-1/2) times the normal rate as shown in the Wage Rate Schedule herein for the first

**183**

eight (8) hours work, which shall be a guarantee. Work performed after eight (8) hours on those days shall be paid for at one and one-half (1-1/2) times the applicable premium rate.

(e) Employeès on night work whose regular work begins on a Sunday or holiday evening, or ends on a Sunday or holiday morning, shall be given either the night before or the night after off, for their Sunday or holiday, in accordance with the Work Schedule. Regular employees shall not be deprived of their sixth punch by the use of extra help. Except in cases specifically agreed upon between the Employer and the Union, work on a night shift shall be treated as being performed on the day on which the shift ends. The holiday night shall not be staggered by the splitting of a single shift.

(f) If any of the above-named holidays occur when an employee is on vacation, he shall receive an extra day's pay in lieu of the holiday.

## ARTICLE 50 - VACATIONS

(a) Regular employees who have been on the Employer's payroll for one (1) year and who have worked at least one hundred thirty-five (135) days during that year, including any absence resulting from the performance of duties under this Agreement, shall be entitled to one (1) week's vacation with pay in each year to be taken during the vacation period provided in subsection (f) hereof. The requirement of 135 days of employment applies only to the first year of employment. In subsequent years all employees must work a minimum of twenty-five (25) days to qualify for vacation. The above provision shall be waived for employees retiring as of January 1 of any year; provided notice is given to Employer in December of previous year.

New employees hired during the previous year who are entitled to a vacation and older employees who do not work a full year shall receive vacation pay equal to the average of their earnings for the full weeks which they worked in that year, with a minimum of forty (40) hours at the current hourly rate.

All regular employees shall receive their vacation pay due them in advance on the basis of their earnings for the previous calendar year ending December 31, one fifty-second (1/52nd) of their earnings for each week of vacation, but not less than forty (40) hours' pay per

week at the current hourly rate. Any employee who is discharged or who quits between January 1st and May 1st shall receive the vacation allowance due him for that year. The Employer agrees he will issue separate checks for employees' vacations.

(b) Employees with two (2) years or more service shall be entitled to two (2) weeks' vacation with pay in each year.

(c) Employees whose eighth (8th) anniversary date falls on or after April 1, 1991, shall be entitled to three (3) weeks of vacation with pay in each year.

(d) Employees with fifteen (15) years or more service shall be entitled to four (4) weeks' vacation with pay in each year.

(e) Employees with twenty (20) years or more of service shall be entitled to five (5) weeks' vacation with pay in each year.

(f) Vacations must be taken between May 1 and October 31, unless otherwise mutually agreed to between the Employer and the Union, and any employee who has completed the required service before or within the vacation period shall be granted a vacation as provided herein. Notwithstanding the above, the fifth (5th) week of vacation as provided in (e) above must be taken outside of the vacation period so stated, but must be taken in the calendar year in which it is earned unless otherwise mutually agreed to between the Employer and the Union.

(g) The minimum number of regular employees allowed on vacation during the vacation period of 5/1-10/31 shall be ten percent (10%) of the number of active employees on the seniority list, by classification, unless otherwise agreed to.

(h) The vacation schedule must be posted by the Employer not later than April 1st to allow employees in the order of their seniority to make their vacation selection. The schedule shall remain posted for thirty (30) days, after which time it shall be taken down. Employees in the first 50% from the top of the seniority list must make their selection within the first fifteen (15) days after posting. Balance of board shall make selection in the remaining fifteen (15) days. Any employee failing to make his selection during such periods shall be assigned to whatever vacation period may be open.

i) Upon discharge by the Employer, or quit by the employee, earned

**185**

vacation time and pay shall be included in all final wage payments. In case of death of an employee who is eligible for a vacation, vacation pay due such an employee shall be paid to the employee's estate.

# ARTICLE 51 - MISCELLANEOUS

## Section 1. Accident Reports

Any employee involved in any accident shall immediately or as soon as possible report said accident and any physical injury sustained. When required by his Employer, the employee before going off duty, and before starting his next shift, shall make out an accident report, in writing, on forms furnished by the Employer, and shall turn in all available names and addresses of witnesses to the accident. Such report shall be made out on the Company time.

## Section 2. Court Appearances

When an employee is required to appear in any court for the purpose of testifying, because of any accident he may have been involved in during working hours, such employee shall be reimbursed in full by the Employer for all earning opportunity lost because of such appearance. The Employer shall furnish the employee who is involved in an accident during working hours, with bail, bond and legal counsel, and shall pay in full for same. Said bail, bond and legal counsel shall remain assigned to the employee until all legal action in connection with said accident is concluded, provided the employee is not charged and convicted of criminal negligence. This Section shall not apply to employees who are found guilty of drunken driving when involved in an accident during working hours.

## Section 3. Safety Violations

(a) Equipment-Employees shall not be held responsible for vehicles not properly equipped to comply with State Motor Vehicle Laws, and shall be compensated for fines and time lost if summoned to court, etc., because of the same.

(b) Overloads-Employees shall not be held responsible for overloading vehicles. Whenever a driver is penalized because of such overload, the Employer shall bear all costs in connection with such

**186**

overload penalty, and shall pay all damages and assessments against the employee, including accrued overtime for delay, and/or any lost earning opportunity that the employee might suffer.

In the event the employee shall suffer a revocation of his chauffeur's license because of the violation of any laws by the Employer, the Employer shall provide suitable and continued employment for such employee, at not less than his regular earnings at the time of revocation of license, for the entire period of revocation of license, and the employee shall be reinstated to his previous assignment held prior to revocation of driver's license, after his driver's license is restored.

(c) Winter Safety Equipment-The Employer shall install heaters and defrosters or equipment required by law on all trucks and tractors.

## Section 4. Bonds

Should the Employer require any employee to give bond, cash bond shall not be compulsory, and any premium involved shall be paid by the Employer.

## Section 5. Examinations

All examinations when required by the Employer and performed under his direction shall be paid for by the Employer. Employees, other than applicants, shall be paid for all time required to take all such examinations, not to exceed two (2) hours at the straight time hourly rate of pay. If a dispute develops between the Employer and the Union as to whether or not the employee is physically qualified to work, the Union and the Employer shall mutually agree to an impartial doctor, hospital, clinic, etc., for the purpose of resolving the physical qualifications of the employee. All fees involved shall be borne by the Employer.

## Section 6. Personal Identification

If the Employer requires employees to carry personal identification, the cost of such personal identification shall be borne by the Employer.

## Section 7. On-the-Job Claims

The Employer agrees to cooperate toward the prompt disposition of employee on-the-job injury claims.

**187**

## Section 8. Loss or Damage

Employees shall not be charged for loss or damage unless clear proof of negligence is shown. This Section is not to be construed as permitting charges for loss or damage to equipment under any circumstances.

## Section 9. Access to Premises

Authorized agents of the Union shall have access to the Employer's establishment during working hours, including the right to check trucks in transit, investigate working conditions, collect dues, and inspect all time cards, log books and other payroll records of the Employer, for the purpose of determining whether or not the terms of this Agreement are being complied with. The Employer will make such records available within seven (7) days of the Union's request and will provide a suitable bulletin board in a conspicuous place for posting of information of interest to the members of the Union.

## Section 10. Injury on the Job

When a regular employee is injured on the job, he shall be guaranteed eight (8) hours' pay for the day injured, provided he is instructed to cease work as a result of an injury, by the Employer or his physician. (If required to visit hospitals, clinics, doctors' offices or other places for treatment or diagnosis, during days he is working during working hours, he shall be paid for the time involved in travel and treatment with a guarantee of eight (8) hours, and if required to make such visit outside working hours, he shall be paid for the time involved in travel and treatment, but not more than two (2) hours at his normal straight time rate of pay.)

## Section 11.

The Employer shall not hire employees who are gainfully employed on a full time basis elsewhere inside or outside the trucking industry, unless in conflict with applicable State or Federal law.

## Section 12. Other Equipment

(a) The Employer shall not require, as a condition of continued

**188**

employment, that an employee purchase a truck, tractor and/or tractor and trailer or other vehicular equipment.

(b) The Employer will not hire outside trucks except to supplement its own equipment when such equipment is in full use. When hired trucks are required, the men required to operate and work on them, irrespective of ownership shall be paid as employees of the Employer and shall be governed by the terms of this Agreement while so employed.

## Section 13. Death in Family

In the event of a death of the employee's immediate family, i.e., father, mother, sister, brother, son, daughter, husband or wife, it is recognized that the employee may need time off to attend the funeral services. A leave of absence will be granted the employee for the day of burial, the two (2) days preceding the day of burial and the day after burial. When these days fall within the regular workweek, Monday through Friday or Tuesday through Saturday, the Employer will pay to the employee his regular straight time pay for eight (8) hours per day for such days of absence. Notwithstanding the above, should an employee suffer a death in the employee's immediate family, he shall be guaranteed at least two (2) days of paid funeral leave.

## Section 14.

Terminal yardmen and hostlers shall be provided with rain gear. Any employee physically handling in substantial quantities, hides, creosoted items, spun glass, lamp black, barbed wire, and acids, shall be provided with rubber or leather aprons and gloves, not to exceed two (2) pair per calendar year, per yardman.

## Section 15.

The Employer agrees to deduct certain specific amounts each week from the wages of those employees who shall have given the Employer written authorization to make such deductions. The amount so deducted shall be remitted to the Teamsters Credit Union once each week. The Employer shall not make deductions and shall not be responsible for remittance to the Credit Union for any deductions for those weeks during which the employee has no earnings or in those weeks in which the employee's earnings shall be less than the amount authorized for deduction.

**189**

## Section 16.

Citizen Band Radios shall be permitted, subject to reasonable Company rules and regulations.

## Section 17.

The Employer and Union agree to negotiate rates and language for a Multimodal Container addendum to the New England Supplemental Freight Agreement.

## Section 18. Administrative Dues

Each Local Union under this Supplement may, at its discretion, implement Administrative Dues as outlined below.

Effective 4/1/88 and continuing thereafter during the life of this Agreement and in accordance with the terms of an individual and voluntary written checkoff of membership dues in a form permitted by Section 302(c) of the Labor-Management Relations Act, the Employer agrees to deduct weekly from the wages of each employee covered by this Agreement who signs said authorization:

Five cents (.05) per hour for each payroll hour worked or paid to said employee for a maximum of forty (40) hours during the week as Administrative Dues, provided that Administrative Dues shall not be deducted for those employees who are out on occupational or non-occupational injuries.

All monies collected for Administrative Dues by the Employer shall be held in trust by the Employer until paid to the Union. The administrative Dues which are deducted shall be paid monthly by the tenth (10th) of the month following the month in which they were deducted.

## Section 19. Sick Leave

Effective during the term of this Agreement, each regular employee shall be entitled to five (5) days sick leave each year, in accordance with the rules and regulations applying to Article 38 of the NMFA, except that sick leave shall be paid effective the first day of such sickness, provided employees do not abuse the above provision.

## ARTICLE 52 - CLASSIFICATIONS

1. A local driver is any driver not included in the definition of a road driver.

2. A switcher or yardman is an employee who is used to hook up and drop trailer and/or move equipment to or from the loading platform on the Employer's property, and duties incidental thereto, such as, gassing, fueling and checking equipment.

3. A power unit operator is an employee engaged in the operation of a power-driven unit in connection with the safe loading or unloading of freight.

4. A checker and/or dragline operator is an employee who is assigned to the handling of waybills, the checking of merchandise and the safe loading and unloading of vehicles, and duties incidental thereto.

5. A helper is an employee whose duty is to assist the driver in all work except the actual driving of a truck.

6. A platform man and/or warehouseman and/ or dragline man who is not assigned to handle waybills is an employee who is regularly employed on a freight platform or dock in connection with the safe loading and unloading of vehicles, and duties incidental thereto.

7. A lumper is an employee who directs a freight crew on a pier and who relays orders to other employees in the absence of management.

8. A winchman is an employee who operates a winch in connection with rigging work as herein described.

9. A lead man or first-class rigger is an employee who works and directs rigging operations and rigging crews. This classification shall apply except where work is performed under AGC Agreement on job site construction. Rigging is in addition to cribbing, blocking, etc. and includes any specialized equipment other than a crane or a similar type of equipment making lift or hoist.

10. A second-class rigger is an employee who assists a first-class rigger in performing a rigging operation.

11. A working foreman is an employee who works with, and directs other employees, and who may relay orders to other employees in the absence of management.

**191**

12. A local double-bottom chauffeur is an employee who pulls a combination of two pieces of equipment between terminals and/or staging area and is on an hourly rate of pay.

13. A low bed trailer operator is an employee who operates any low bed trailer.

# ARTICLE 53 - HOURS OF WORK
# AND OVERTIME

## Section 1.

Five (5) days shall constitute a normal week's work for local employees from Monday to Friday inclusive, and the hours of labor each day shall be worked in uninterrupted succession. All time worked in excess of eight (8) hours per day shall be paid as overtime at one and one-half times the normal rate.

## Section 2.

Employees ordered to report for work before their starting time shall be guaranteed eight (8) hours work or pay in addition to the time worked before their starting time with time and one-half for all hours over eight (8). Any employee ordered to work after his regular starting time shall have his time revert back to his regular starting time.

## Section 3.

(a) Any employee who is called or reports as scheduled shall be guaranteed a minimum of eight (8) hours' work or pay.

(b) All employees required to report on Saturday, as such, shall be guaranteed a minimum of eight (8) hours' work at their applicable premium rate of time and one-half (1-1/2). Any time worked in excess of eight (8) hours on Saturday shall be paid for at one and one-half (1-1/2) times the applicable premium rate.

(c) All employees required to work on a sixth report in a payroll period shall be guaranteed a minimum of eight (8) hours at their applicable premium rate of time and one-half (1-1/2). Any time worked in excess of eight (8) hours on those days shall be paid for

at one and one-half (1-1/2) times the applicable premium rate, except as otherwise mutually agreed to by the Employer and the Local Union regarding replacements.

(d) Except for meal time, working time for all employees shall start when they are instructed to report and do report, at terminal or garage and shall continue until relieved from duty at same regardless of occupation. Employees shall be allowed time out for meals at the Employer's directions which shall be either one (1) hour or one-half (1/2) hour and shall not begin until the employee has worked four (4) hours, but must begin before he has completed five (5) hours of work. However, the Employer agrees to establish a uniform practice as to all platform employees which shall remain in effect unless changed by the Employer not more than once in a thirty (30) day period.

Any employee who is ordered to work during any part of his one (1) hour or his one-half (1/2) hour meal period, whichever the case may be, shall be paid for the full meal period and shall be allowed and must take twenty (20) minutes to eat lunch and such time shall be considered as time worked. An employee who is ordered to work during any part of his one (1) hour meal period shall receive a minimum of nine (9) hours' pay on that day. An employee who is ordered to work during any part of his one-half (1/2) hour meal period shall receive a minimum of eight and one-half (8-1/2) hours' pay on that day.

## Section 4.

(a) A daily time record shall be maintained by the Employer for all of his employees. Any Employer who employs five (5) or more employees shall have a time clock, and the employee's time shall be computed by the time clock on time cards. Employer with less than five (5) employees who does not have a time clock shall permit employees to keep their own time records.

(b) Each employee shall "punch in" his own time card at the start of the day, and "punch out" his own time card at the completion of the day's work at the Employer's place of business.

(c) Employees assigned to work and/or completing their work away from the Employer's place of business shall be exempt from punching in and out. In the event that any employee is ordered to report

**193**

at, or leave his vehicle at, a different place than his usual starting point, such employee shall be paid transportation expenses back to his starting point. All such traveling time shall be considered as time worked.

## Section 5. Break Bulk Terminal Operation

(a) A break bulk terminal operation may be established upon the mutual agreement of an Employer and a Local Union as long as such agreement is equal to the standards established by this Break Bulk Negotiating Committee. Failing agreement, shall come before this Break Bulk Negotiating Committee for approval.

(b) Employers who operate a break bulk operation shall establish a scheduled workweek consisting of any five (5) consecutive days out of a seven (7) day period.

(c) Forty (40) hours shall constitute a normal week's work. All employees required to report for work on their unscheduled days shall be guaranteed a minimum of eight (8) hours' work at their applicable premium rate of time and one-half. Any time worked in excess of eight (8) hours on those days shall be paid for at one and one-half times the applicable premium rate. Breakbulk operations may institute straight time eight (8) hour shifts with two (2) twenty (20) minute paid breaks upon mutual agreement between the parties.

(d) In the event of absenteeism on any schedule commencing within a calendar day the vacancy may be filled by:

 (1) A regular seniority employee, in laid-off status, in seniority order.

 (2) A non-seniority or casual employee.

(e) When the number of employees on a schedule is increased, the work is assigned.

 (1) A regular seniority employee, in laid off status, in seniority order.

 (2) An eligible, qualified employee that has completed his regular schedule and is available for a sixth punch,

 except that spare employees up to 15% of the total employees on

**194**

the dock and yard list, may be used prior to

the calling of employees for premium time. Seniority shall prevail.

(3) Available non-seniority or casual employee.

(f) Holidays - Article 49 will apply; however, in the event the schedules are maintained and work performed on the holiday, employees will work their assigned schedules and will be paid the rate of time and one-half (1-1/2) in addition to the eight (8) hours' holiday pay. Replacements for absentees on a holiday will be worked in accordance with Item (e).

(g) Break bulk operation includes dock work, switching assignments inside the yard, shuttle to and from compounds and terminals.

(h) All local pickup and delivery performed on Saturday, Sunday or a holiday shall be treated as work performed under the terms of Article 53, Section 3 of the New England Supplemental Agreement.

(i) The parties agree all employees working in the classifications of dockwork and yard assignments, as stated above, shall be entitled to all other terms and conditions as set forth in the N.M.F.A. and N.E.S.F.A. dated March 1, 1982.

(j) When a break bulk terminal is established, present schedules on the Sunday thru Thursday and Monday thru Friday workweek shall be maintained. However, with the exception, those employees, within their seniority may bid other work schedules. This is not to be considered to be a guarantee.

The Employer and Local Union may agree to road driver provisions and method of dispatch as it pertains to a seven (7) day breakbulk operation and submit such agreement to the New England Supplemental Negotiating Committee.

## ARTICLE 54 - WAGES AND ALLOWANCES

(a) Classifications

Drivers, Checkers, Lumpers, Power Unit Operators, Switchers, Yardmen, Teamsters, Drag Line Operators, Twin-pup trailer drivers in accordance with applicable Local, State and Federal Law.

**195**

|                    | Per Hour |
|--------------------|----------|
| Effective 4/1/98   | $18.43   |
| Effective 4/1/99   | 18.78    |
| Effective 4/1/00   | 19.13    |
| Effective 4/1/01   | 19.48    |
| Effective 4/1/02   | 19.83    |

### Helpers, Platform Men, Stablemen, Warehouseman

|                    | Per Hour |
|--------------------|----------|
| Effective 4/1/98   | $18.33   |
| Effective 4/1/99   | 18.68    |
| Effective 4/1/00   | 19.03    |
| Effective 4/1/01   | 19.38    |
| Effective 4/1/02   | 19.73    |

### Double Bottom Men

|                    | Per Hour |
|--------------------|----------|
| Effective 4/1/98   | $18.48   |
| Effective 4/1/99   | 18.83    |
| Effective 4/1/00   | 19.18    |
| Effective 4/1/01   | 19.53    |
| Effective 4/1/02   | 19.88    |

### 1st Class Riggers, Lead Men, Winchmen, Low Bed Trailer Operators

|                    | Per Hour |
|--------------------|----------|
| Effective 4/1/98   | $18.78   |
| Effective 4/1/99   | 19.13    |
| Effective 4/1/00   | 19.48    |
| Effective 4/1/01   | 19.83    |
| Effective 4/1/02   | 20.18    |

### 2nd Class Riggers

|                    | Per Hour |
|--------------------|----------|
| Effective 4/1/98   | $18.68   |
| Effective 4/1/99   | 19.03    |
| Effective 4/1/00   | 19.38    |
| Effective 4/1/01   | 19.73    |
| Effective 4/1/02   | 20.08    |

Working Foremen and Dispatchers

|  | Per Hour |
|---|---|
| Effective 4/1/98 | $18.53 |
| Effective 4/1/99 | 18.88 |
| Effective 4/1/00 | 19.23 |
| Effective 4/1/01 | 19.58 |
| Effective 4/1/02 | 19.93 |

Employees older in service and in the order of their seniority shall be entitled to the work available from Monday to Friday inclusive in amounts not less than those designated in the Schedule above. Should the Employer violate this principle, he shall compensate for the earning opportunity lost and at the rate provided herein those employees affected.

(b) Entry Rates (New Hires/Probationary Employees)

Refer to Article 36 of the 1998-2003 N.M.F.A.

(c) Casual Employees

|  | Per Hour |
|---|---|
| Effective 4/1/98 | $15.56 |
| Effective 4/1/99 | 15.86 |
| Effective 4/1/00 | 16.16 |
| Effective 4/1/01 | 16.46 |
| Effective 4/1/02 | 16.76 |

All dock casuals' wage rates will remain frozen at $15.00 per hour during the full-term of the 1998-2003 NMFA.

(d) Any employee working in a higher pay classification for any part of the day shall receive the higher rate of pay for the entire day.

(e) No employee shall be required to deadhead for any rate less than his normal rate of pay.

(f) Any local employee required to sleep away from home shall be provided satisfactory sleeping quarters by the Employer plus $15.00 for meal allowance.

# ARTICLE 55 - CLASSIFICATIONS
# AND TRIP RATES

(a) A road driver is an employee operating on line haul between the terminal areas.

**197**

(b) On all dispatches from point of origin to destination at which the driver takes a statutory rest period, or from point of origin to destination and return with no statutory rest period at destination, the driver shall be guaranteed eight (8) hours' pay.

When the miles driven times the applicable mileage rate exceeds the guarantees above, the driver shall be so compensated. Hours worked shall be paid in addition. When it does not exceed the mileage guarantee he shall be compensated at the applicable hourly rate.

(c) All drivers who report and are not dispatched shall be guaranteed the equivalent of the smallest paid round trip out of their Company, but in no case shall this amount be less than eight (8) hours' pay.

## ARTICLE 56 - MILEAGE RATES

Mileage rates for road drivers shall be as follows:

|                   | Per Mile |
|-------------------|----------|
| Effective 4/1/98  | 45.0500¢ |
| Effective 4/1/99  | 45.9250¢ |
| Effective 4/1/00  | 46.8000¢ |
| Effective 4/1/01  | 47.6750¢ |
| Effective 4/1/02  | 48.5500¢ |

The mileage rate for road drivers operating twin/pup trailers shall be an additional 1.225 cents per mile of the established mileage rates as indicated above. Except where road drivers are currently enjoying a greater rate, such individual road drivers shall be red circled until such time as the new mileage rates for twin/pups equals or exceeds such red circled mileage rates.

## ARTICLE 57 - PICK-UPS, DELIVERIES AND RATE FORMULA

(a) All over-the-road operations shall be from terminal to terminal or to check points or relay points or from any one of these to another. Road drivers shall make drops and/or hooks of their own units at the home domicile, unless other agreements exist between the Company and the Union.

**198**

(b) A Road Driver shall not be permitted to make pickups or deliveries within the terminal area of any other Local Union affiliated with the International Brotherhood of Teamsters, unless permission has been or is granted by the Business Agents of the Local Unions involved, his own Agent and the Agent of the Local Union in the area where the pickup or delivery is to be made.

(c) A Road Driver shall not make any pickups and/or deliveries to a consignee or shipper in any of the terminal areas, but must take the freight into the terminal if the Employer has one there. He shall be paid at the normal rate per hour for all time consumed in effecting such terminal pickups and drops, or delay time at terminals.

(d) Any pickup or deliveries to or from a contract or connecting carrier, or a consignee or shipper, shall be paid for at the normal rate per hour for all time consumed.

Drop and/or pickup of empty, partially loaded or fully loaded trailers or combination of both drop and pickup regardless of weight shall be paid for at the normal rate per hour for all time consumed.

(e) Any claim for time consumed in road failure, or other delays resulting from Acts of God, snow or impassable highways shall be submitted in writing by the employee upon completion of the trip, and each claim shall be adjusted at the normal rate per hour for the amount of time involved.

(f) The normal rate of pay for hourly work performed by Road Drivers other than overhead and sleeper drivers shall be the rate set forth for drivers in Article 54.

(g) When transportation is required to sleeping quarters, it shall be provided by the Employer within thirty (30) minutes after the driver is relieved from duty. If the Company fails to do so within the thirty (30) minute free time period, the driver shall be paid for each minute from relieved of duty time to such time transportation is available, at the applicable hourly rate of pay.

## ARTICLE 58 - RELIEF HOLDOVER, PREMIUM PAY & EXPENSES

(a) All drivers relieved from duty at a terminal, check point or relay

**199**

point away from home shall be dispatched on a trip within fourteen (14) hours.

(b) On a Saturday night or holiday eve, if a road driver is not dispatched direct to his home terminal over the routes commonly traveled before 10:00 p.m., he shall be compensated at the rate of time and one-half for that one-half portion of his trip, including pickups, drops and terminal time enroute. A road driver dispatched after 10:00 p.m. must be dispatched directly to his home terminal, over routes commonly traveled by each carrier, at the rate of time and one-half. This does not apply to overhead drivers.

(c) Satisfactory sleeping quarters shall be provided by the Employer at terminal layover points, and at all other points that require sleeping quarters.

In addition seven dollars and fifty cents ($7.50) shall be paid at the start of each trip for personal expenses.

(d) If a road driver is to be held over beyond his fourteen (14) hours off duty and is so notified not later than the fourteenth (14th) hour, he shall receive twenty-four dollars ($24.00) hold-over pay.

He shall also receive for each subsequent fourteen (14) hour period or part thereof until he is dispatched the full cost of his sleeping quarters.

(e) If not dispatched or notified of a holdover, he may be held at his normal rate from the fourteenth to the twenty-second hour. If not then dispatched, he shall receive twenty-four dollars ($24.00) hold-over pay.

In addition, for each subsequent fourteen (14) hour period or part thereof until he is dispatched, he shall receive the full cost of his sleeping quarters.

## ARTICLE 59 - DROPPING TRAILERS

(a) The Employer will not drop a trailer to be loaded or unloaded at any place unless the work of loading, unloading and switching is performed by his employees working under this Agreement.

(b) Competitive Dropping of Trailers

**200**

The Employer will not drop a trailer to be loaded or unloaded unless the customer has been determined by the Company and the Local Union to be a competitive drop. Trailers dropped for less than twenty-four (24) hours during a layoff must be covered by bargaining unit employees, except in cases of customers serviced by nonunion carriers.

(c) In the areas where the present practice of dropping a trailer to be loaded or unloaded differs from that set forth in (a) and (b) above, the present practice in effect in that area shall be continued.

(d) Trailers shall not be spotted to circumvent a premium day's pay.

(e) Questions of interpretation regarding this Article shall be submitted directly to the New England Supplemental Negotiating Committee.

## ARTICLE 60 - DOUBLE BOTTOMS

Drivers dispatched for double-bottom operation shall receive double-bottom rate to final destination even though a box, boxes, or kite are picked up or dropped enroute. However, double-bottom rate shall apply only to mileage from Compound nearest origin point to Compound nearest destination point.

## ARTICLE 61 - OVERHEAD OPERATIONS

### Section 1. Definition

Overhead drivers shall be road drivers engaged in moving loads between points in excess of 500 miles, with the first leg of a relay to be in excess of 350 miles, unless otherwise mutually agreed by the Local Union and the Employer.

### Section 2. Single Man Operation Rates

The hourly guaranteed rate shall be as follows:

|                   | Per Hour |
|-------------------|----------|
| Effective 4/1/98  | $18.37   |
| Effective 4/1/99  | 18.72    |
| Effective 4/1/00  | 19.07    |

**201**

Effective 4/1/01                                           19.42
Effective 4/1/02                                           19.77

The rate of pay per mile for drivers on all overhead runs shall be as follows:

| Tandem Axle Unit | 4 axles | 5 axles |
| --- | --- | --- |
| Effective 4/1/98 | 45.0500¢ | 45.1750¢ |
| Effective 4/1/99 | 45.9250¢ | 46.0500¢ |
| Effective 4/1/00 | 46.8000¢ | 46.9250¢ |
| Effective 4/1/01 | 47.6750¢ | 47.8000¢ |
| Effective 4/1/02 | 48.5500¢ | 48.6750¢ |

In addition to the rate of pay per mile provided herein, drivers shall be paid for all time spent on drops, pickups, breakdowns, delay time, impassable highways and deadheading time at the applicable rates provided herein. Lodging shall be paid in addition.

## Section 3. Double Bottom Units

Where regular highway semis are used for double bottom purposes or delivering or transporting freight, other than steel or perishable commodities in which case the rate shall be as follows:

| | |
| --- | --- |
| Effective 4/1/98 | 48.0650¢ |
| Effective 4/1/99 | 48.9400¢ |
| Effective 4/1/00 | 49.8150¢ |
| Effective 4/1/01 | 50.6900¢ |
| Effective 4/1/02 | 51.5650¢ |

If two man operation is involved, each man shall receive one-half of such rate.

## Section 4. Pickup and Delivery

Time spent in making pickups and/or deliveries at points enroute and intermediate terminals and time lost through delay in pickups and/or deliveries at intermediate terminals shall be paid for at the minimum rate of:

| | Per Hour |
| --- | --- |
| Effective 4/1/98 | $18.37 |
| Effective 4/1/99 | 18.72 |
| Effective 4/1/00 | 19.07 |
| Effective 4/1/01 | 19.42 |
| Effective 4/1/02 | 19.77 |

**202**

# Section 5. Mileage Determination For All Runs

(a) In case of a dispute over mileage, same shall be computed over the route by official AAA mileage. When AAA mileage is not current or available, then the latest official state highway maps shall be used to determine the correct mileage. On routes where official mileage is not given by the methods set forth, same shall be logged by the Union and Employer, such findings to be final and binding. When route is logged, the starting point at origin shall be the main U.S. Post Office, and the ending point at destination shall be the main U.S. Post Office.

Upon request of the Local Union, the Company shall provide a mileage chart over its regular routes between cities.

(b) In those cases where miles paid for exceed miles established under (a), the excess miles shall be reduced one-sixth annually each April 1st during the period of this Agreement, provided that in no event shall such reduction of excess miles result in reduction of more than one-half of each applicable mileage increase provided herein, calculated on the mileage paid for on the effective date of this Agreement. The first adjustment shall be made no later than April 1, 1988. In applying the one-sixth formula, fractions shall be rounded to the closest whole number.

Where the total miles on a run are considered, fractional paid for miles shall be rounded to the next highest whole number.

In no case shall the reduction of miles as set forth herein change or alter existing guarantees or conditions based upon present paid-for mileage.

(c) If as a result of mileage determinations as provided in subsection (a) the Company is paying for less than the actual miles traveled, the mileage payments based upon the new mileage increase shall become effective immediately. If, however, a reduction in mileage payments becomes necessary because of new roads, new routes, alternate routes or expressways such mileage shall be decreased by no more than one-sixth annually in accordance with the formula above set forth in subsection (b).

# Section 6. Schedule of Dispatching

Truck Drivers may be dispatched ahead of regular relay runs pro-

vided such dispatch would not result in cancellation of regular relay runs.

## Section 7. Lodging

Comfortable, sanitary lodging shall be furnished by the Employer in all cases where an employee is required to take a rest period away from his home terminal, and shall be maintained at present-day standards. Comfortable, sanitary lodging shall mean a room with not more than two beds in it and not more than two drivers sleeping in the room at the same time, except in dormitories at company-owned terminals, with janitor service, clean sheets, pillow cases, blankets, hot and cold running water, good ventilation and easy access to clean, sanitary toilet facilities in the building and shall also be equipped with showers and/or bath and air-conditioned rooms. There shall be no bunk beds or double beds. In addition dormitories in new terminals must be sound-proofed, and shall not provide for more than two men in a room.

Road driver lodging shall be maintained on the basis of one driver per room except in emergencies. Existing dormitories or other accommodations operated as dormitories may be continued on the basis of two drivers per room provided that they are from the same domicile and are put to bed within one (1) hour of each other. Dormitories which are commenced to be constructed ninety (90) days after notice of ratification shall provide for one (1) driver per room. This provision shall not apply until such accommodations are available. At hotels and motels two (2) men will be permitted to stay in the same room provided the second driver is assigned the room within two (2) hours.

Where an existing dormitory currently provides for two men in a room, such practice shall be continued. In all terminals with dormitories there shall be a drivers' waiting room maintained at present day standards. In all other cases where the Company does not provide drivers with a waiting facility which is adequate under the circumstances, it shall be taken up as a grievance.

Air-conditioned dormitories, or air-conditioned hotel rooms if available, shall be furnished when seasonal and climatic conditions require. Hotel rooms and dormitories shall be equipped with blinds or draperies or be suitably darkened during daylight hours.

A road driver relieved from duty at a Company terminal or a rest

**204**

period away from home shall receive Fourteen Dollars ($14.00) for room rent.

If accommodations are unavailable at such figure and it is necessary for a driver to pay in excess of the above amounts he shall receive reimbursement of actual cost of room. The Company shall furnish transportation to and from the nearest public transportation, when there is no public transportation available and further provided that this provision shall not apply where driver is allowed to use tractor for transportation.

All new dormitories must provide for one (1) man to a room. Room rent of owner-operator shall not be deducted from gross receipts or truck earnings regardless of whether truck rental is at minimum rate or above.

No new dormitory at company-owned terminals shall be permitted.

## Section 8. Paid For Time - General

All employees covered by this Agreement shall be paid for all time spent in the service of the Employer. Rates of pay provided for by this Agreement shall be minimums. Time shall be computed from the time that the employee is ordered to report for work and registers in and until the time he is effectively released from duty. All time lost due to delays as a result of over-loads or certificate violations involving federal, state or city regulations, which occur through no fault of the driver, shall be paid for. Such payment for driver's time when not driving shall be the hourly rate.

## Section 9. Call-In Time

Drivers called to work shall be allowed sufficient time, without pay, to get to the garage or terminal, and shall draw full pay from the time ordered to report and register in. If not put to work, employees shall be guaranteed six (6) hours' pay at the rate specified in this Agreement. If such employee is put to work he shall be guaranteed a minimum of eight (8) hours' pay.

## Section 10. Layovers

Where a driver is required to lay over away from his home terminal, layover pay shall commence following the fourteenth (14th) hour

**205**

after the end of the run. If driver is held over after the fourteenth (14th) hour he shall be guaranteed two (2) hours' pay, in any event, for layover time. If he is held over more than two (2) hours, he shall receive layover pay for each hour held over up to eight (8) hours in the first twenty-two (22) hours of layover period, commencing after the run ends. The same principle shall apply to each succeeding eighteen (18) hours, and layover pay shall commence after the tenth (10th) hour.

When on layover on Sundays and holidays there shall be a meal allowance of Six Dollars ($6.00) for the first meal; Six Dollars ($6.00) for the second meal; and Seven Dollars and Fifty Cents ($7.50) for the third meal.

No more than three (3) meals will be allowed during any 24 hour period. Also, employees shall receive meal allowance each time they are held beyond the sixteenth (16th) hour of the first layover period and after the tenth (10th) hour on subsequent layovers after the first.

Driver shall not be compelled to report to work at home terminal until he has had ten (10) hours off-duty time.

Whenever any Employer arbitrarily abuses the free time allowed in this Section, then this shall be considered to be a dispute and the same shall be handled in accordance with the grievance procedure set forth in this contract.

## Section 11. Breakdowns or Impassable Highways

On breakdowns or impassable highways, drivers on all runs shall be paid the minimum hourly rate for all time spent on such delays, commencing with the first hour or fraction thereof, but not to exceed more than eight (8) hours out of each twenty-four (24) hour period, except that when an employee is required to remain with his equipment during such breakdown or impassable highway, he shall be paid for all such delay time at the rate specified in this Agreement. Where an employee is held longer than an eight (8) hour period, he shall, in addition, be furnished clean, comfortable, sanitary lodging, plus meals. The pay for delay time shall be in addition to monies earned for miles driven and/or work performed.

Time required to be spent with the equipment shall not be includ-

ed within the first eight (8) hours of each twenty-four (24) hour period for which a driver is compensated on breakdown or impassable highways, but must be paid for in addition.

## Section 12. Deadheading

In all cases where an employee is instructed to ride or drive on Company or leased equipment, he shall receive full pay as specified in this Agreement; when instructed to deadhead on other than Company or leased equipment, the employee shall likewise receive the full rate of pay as specified in this Agreement, plus the cost of transportation.

## Section 13. Bobtailing

Driving of tractor without trailer shall be paid on the same basis as tractor-trailer drivers.

## Section 14. Dropping Trailer

(a) The Employer will not drop a trailer to be loaded or unloaded at any place unless the work of loading, unloading and switching is performed by his employees working under this Agreement.

(b) Competitive Dropping of Trailers

The Employer will not drop a trailer to be loaded or unloaded unless the customer has been determined by the Company and the Local Union to be a competitive drop. Trailers dropped for less than twenty-four (24) hours during a layoff must be covered by bargaining unit employees, except in cases of customers serviced by nonunion carriers.

(c) In the areas where the present practice of dropping a trailer to be loaded or unloaded differs from that set forth in (a) and (b) above, the present practice in effect in that area shall be continued.

(d) Trailers shall not be spotted to circumvent a premium day's pay.

(e) Questions of interpretation regarding this Article shall be submitted directly to the New England Supplemental Negotiating Committee.

207

## Section 15. Double Bottoms

Drivers dispatched for double-bottom operation shall receive double-bottom rate to final destination even though a box, boxes, or kite are picked up or dropped enroute. However, double-bottom rate shall apply only to mileage from Compound nearest origin point to Compound nearest destination point.

## Section 16.

Article 29 in the National Agreement, applying to "Piggyback" shall also apply to single-man and double-man overhead operations.

# ARTICLE 62 - TWO-MAN OPERATION

## Section 1. Mileage Rates of Pay

The following rate of pay shall prevail for the two-man operation:

| (A) | Two-man Rate Per Mile | Single-man Rate Per Mile |
|---|---|---|
| Effective 4/1/98 | 46.9600¢ | 23.4800¢ |
| Effective 4/1/99 | 47.8350¢ | 23.9175¢ |
| Effective 4/1/00 | 48.7100¢ | 24.3550¢ |
| Effective 4/1/01 | 49.5850¢ | 24.7925¢ |
| Effective 4/1/02 | 50.4600¢ | 25.2300¢ |

| (B) Double Trailer | Two-man Rate Per Mile | Single-man Rate Per Mile |
|---|---|---|
| Effective 4/1/98 | 47.4600¢ | 23.7300¢ |
| Effective 4/1/99 | 48.3350¢ | 24.1675¢ |
| Effective 4/1/00 | 49.2100¢ | 24.6050¢ |
| Effective 4/1/01 | 50.0850¢ | 25.0425¢ |
| Effective 4/1/02 | 50.9600¢ | 25.4800¢ |

## Section 2. Pickup and Delivery and Delay Time

The rate of pay for pickup and delivery or delay time shall be as follows:

Pickup and delivery shall be paid for at the full hourly rate for each man but shall not apply to the man whose log of the run shows he

**208**

is on a rest period at the time the pickup or delivery is made. Full allowance for breakdown, layover, impassable highway and dead-heading time and for lodging, etc., as specified elsewhere in this Agreement, shall obtain for both men.

Both drivers on two-man operations shall receive the same rate of pay when delayed on pickup and delivery, except when backed up into the dock and ready to unload, at which time only the one man on duty shall receive the hourly rate of pay.

Hourly Rates of Pay

| | |
|---|---|
| Effective 4/1/98 | $18.37 |
| Effective 4/1/99 | 18.72 |
| Effective 4/1/00 | 19.07 |
| Effective 4/1/01 | 19.42 |
| Effective 4/1/02 | 19.77 |

There shall be no allowance for time spent taking fuel and oil enroute between terminals. Flagrant abuse of free time shall constitute a violation of this Section, and shall be subject to the grievance machinery.

## Section 3.

There shall be no two-man operation on runs less than eight hundred (800) miles round trip unless otherwise agreed to.

## Section 4. Sleeper Cab

Sleeper cab operations shall be between designated terminals with a designated home terminal. An Employer shall not operate sleeper cabs over the same route where he has established relay runs or through runs, except to move an unusual or overflow of freight, and in such event drivers employed on relay runs or through runs shall have full guaranteed preference unless otherwise agreed to, and sleeper cab drivers shall be compensated either by the mileage rate or hourly rate for all time spent on such relay route. Where sleeper cab drivers are required to lay over away from their home terminal, layover pay shall commence following the twelfth (12th) hour after the end of the run. If driver is held over after the twelfth (12th) hour, he shall be guaranteed two (2) hours' pay, in any event, for layover time.

If he is held over more than two (2) hours, he shall receive layover

**209**

pay for each hour held over up to eight (8) hours in the first twenty (20) of layover period, commencing after the run ends. This pay shall be in addition to the pay to which the man is entitled if he is put to work at any time within the twenty (20) hours after the run ends. The same principle shall apply to each succeeding eighteen (18) hours, and layover pay shall commence after the tenth (10th) hour. All other provisions of Article 62 shall apply except as may be provided below.

## Section 5.

The layover provisions of this Article shall apply at only one away-from-home terminal, and all time spent at all other points touched on a round trip from the home terminal, exclusive of meal time, is to be paid for at the full hourly rate to each man. The layover provision of this Article is to be applicable at such away-from-home terminal the first time reached on a round trip away from the home terminal, and such layover point shall be designated on the driver's original orders prior to the dispatch from point of origin and shall remain the same whether or not the driver touches that point. Upon the second or subsequent arrival at such away-from-home terminal prior to return to the home terminal, all time shall be paid for both men, and the layover provision shall not apply. All sleeper teams must be sent to their home terminal on the third dispatch, unless otherwise agreed to. The Employer shall provide in his dispatch rules and/or procedures 24 hours off at the home terminal at least once a week unless otherwise agreed to.

It shall not be considered a violation of the layover clause for a driver to take less than a statutory 8-hour rest period.

## Section 6.

Bedding and fresh linens for sleeper cabs to be furnished and maintained by the Employer in a clean and sanitary condition. Complaints with respect to width, depth, and conditions of mattresses shall be subject to the grievance procedure.

All sleeper equipment must be provided with air-conditioning or a mechanical cooling system and heating appliances. In the event of mechanical failure of such air-conditioning and heating appliances, repairs shall be made at the point of breakdown if proper facilities

**210**

are available. In any event drivers will be paid under the away-from-home terminal breakdown clauses at a point of destination for such repairs.

## Section 7.

Where driver teams are once established it is understood that they are not to be separated unless mutually agreed by the Company, the Union, and the driver team involved, except in case of emergency or reduction in force.

## Section 8.

Drivers who are off duty in the home terminal shall be notified between the hours of 4 p.m. and 6 p.m., if they are to be expected to report for work between the hours of 7 p.m. and 7 a.m., and provided further that drivers who are off duty in the home terminal before 5 p.m. on Saturday who are called to work prior to 12 midnight Sunday shall be given not less than six (6) hours' notice when ordered to report for duty. Above schedule can be changed only by mutual agreement between Local Union and Employer.

The notification required by this Section shall state the approximate time of departure with a two-hour leeway. After having been so notified, one notification to change or cancel the departure time can be given, except where an emergency exists, in which event a notification of the cancellation can be given.

After the emergency passes, normal dispatch procedure shall be resumed.

In the event a notified team, not properly cancelled, reports as notified and is not dispatched, the drivers shall each receive 4 hours call-in time if not put to work, or pay for all time spent after reporting and shall retain their position on the board. This shall not modify the week-end call provisions of the contract and shall not be employed as a subterfuge to avoid the intent and purpose of this interpretation.

The mentioned 6 hours' notice on week-ends shall not be in addition to the 10-hour provision.

In the event a trip becomes available in excess of the number required to protect notified drivers, both drivers on the next team to run shall

**211**

be called up to 12 o'clock midnight. If by midnight such first team refuses or is unavailable, the trip shall be offered to the next teams in order of their standing on the board.

No driver teams may or shall be separated for the purpose of such trip except in case of illness.

Any teams passed in keeping with the above shall retain their position on the dispatch board. The last team having 10 hours rest to which such trip is offered shall be required to take the trip, if no other teams above it takes the trip.

## Section 9.

A sleeper cab trip is exactly as is defined in Article 62, Section 4. During such sleeper cab trip, there may be a pickup or drop of freight and exchange of trailers at one intermediate point outbound and one intermediate point on the return trip, provided:

(1) There shall be no run-around or interference with leg, relay or through runs.

(2) There shall be no deliberate run-around payment as a subterfuge for running around leg, relay, or through runs.

(3) No freight or trailer, excluding empty trailers, shall be picked up outside of the New England Area destined for delivery within the same Area in which the pickup was made.

"Area" as used herein means either Teamsters contract or Teamsters Region Area or as agreed to by the parties.

This provision shall not apply where there is no relay or through run between the points involved, in which case the payment for such part of the trip shall be either under this contract or the Teamster Union contract applicable in such Area, whichever is the higher.

The above may be changed by mutual agreement, taking past practice into consideration, subject to approval of the New England Joint Area Committee.

## Section 10.

Each Over-the-Road Driver of sleeper cab equipment shall receive vacation pay at the period mentioned in the vacation provisions of

this Agreement as follows: Vacation pay shall be computed by dividing the employee's earnings of the last calendar year by fifty-two (52) to determine one week's earnings and then multiplying by the number of weeks earned vacation.

There shall be no exceptions to the above unless an employee is out of work because of his proven illness or injury resulting in inability to work for a cumulative period of four (4) weeks or more as evidenced by a doctor's certificate filed with the Company when returning to work, if required by the Company. Any period of illness or injury less than one (1) week (7 days) duration shall not be used to make up the four (4) weeks. When such conditions occur than the actual annual earnings for the calendar year involved shall be divided by fifty-two (52) less than the number of weeks of proven illness or injury as outlined above.

## Section 11.

Only two (2) men shall be permitted in sleeper cab equipment at any one time except in case of emergency, an Act of God, or where new type equipment is put into operation. In no event shall a master driver be in the cab in addition to the two regular drivers, for more than three hundred (300) miles and then only if requested by a majority of the regular drivers or by agreement of the team involved.

## ARTICLE 63 - OWNER-OPERATORS

All provisions of the National Master Freight Agreement relating to owner-operators shall apply. In addition, the minimum rate for leased equipment owned and driven by the owner-operator shall be:

Single axle tractor only. ....................................32 1/2 cents per mile

Tandem axle tractor only ......................................33 cents per mile

Single axle trailer and 35 to 40 foot tandem trailer only (with $8.00 minimum daily guarantee)..6 1/4 cents per mile

Tandem axle, 40 foot or over, trailer only (with $10.00 minimum daily guarantee) ................................................7 1/4 cents per mile

Minimum daily guarantee for trailers does not apply to Saturday, Sunday, or Holidays It applies to either the first day or last day of use, but not both.

**213**

The above rates also apply to deadheading.

The above rates are based on twenty-three thousand (23,000) pounds load limit for single axle tractors and twenty-seven thousand (27,000) pounds load limit for tandem axle tractors.

On load limits over twenty-three thousand (23,000) pounds there shall be 1/2¢ additional per mile for each one thousand (1,000) pounds or fraction thereof in excess of twenty-three thousand (23,000) pounds.

There shall be a minimum guarantee of twenty-five thousand (25,000) pounds for leased single axle tractors and twenty-seven thousand (27,000) pounds for leased tandem axle tractors owned and driven by the owner-operator.

During the first year of a lease, there shall be a minimum guarantee of $100.00 a month for rental of single axle tractors unless the lease is terminated by mutual agreement or for just cause (which does not include layoff). There shall be an offset against such minimum monthly guarantee to the extent that rental income exceeds the minimum mileage rental revenue provided herein, and to the extent of other for hire rental revenue during periods of lay-offs. The carrier may, at its option, provide a minimum guarantee of twenty-six thousand (26,000) pounds for single axle tractors in lieu of the minimum monthly guarantee provided herein.

Nothing herein shall apply to leased equipment not owned by the driver. The minimum rates set forth above result from the joint determination of the parties that such rates represented only the actual cost of operating such equipment. The parties have not attempted to negotiate a profit for the owner-operator.

## ARTICLE 64 - HEALTH AND WELFARE FUND

(a) Commencing with the 1st day of April, 1998 and for the duration of the current collective bargaining agreement and any renewals or extensions thereof, the Employer agrees to make payments to the respective Health and Welfare Funds for each and every employee performing work within the scope of and/or covered by this collective bargaining agreement, whether such employee is a regular, probationary, temporary or casual employee, irrespective of his sta-

tus as a member or non-member of the Local Union from the first hour of employment subject to this collective bargaining agreement as follows:

(b) Commencing with the 1st day of April, 1998 the Employer shall contribute to the respective Health and Welfare Funds the sum of $3.7625 per hour figured to the nearest quarter hour for which an employee covered by this Agreement receives pay up to a maximum of forty (40) hours but not more than $150.50 per week for any one employee.

Commencing with the 1st day of April, 1999, the Employer shall contribute to the respective Health and Welfare Funds the sum of $3.7625 per hour figured to the nearest quarter hour for which an employee covered by this Agreement receives pay up to a maximum of forty (40) hours but not more than $150.50 per week for any one (1) employee.

Commencing with the 1st day of April, 2000, the Employer shall contribute to the respective Health and Welfare Funds the sum of $4.1625 per hour figured to the nearest quarter hour for which an employee covered by this Agreement receives pay up to a maximum of forty (40) hours but not more than $166.50 per week for any one (1) employee.

Commencing with the 1st day of April, 2001, the Employer shall contribute to the respective Health and Welfare Funds the sum of $4.4125 per hour figured to the nearest quarter hour for which an employee covered by this Agreement receives pay up to a maximum of forty (40) hours but not more than $176.50 per week for any one (1) employee.

Commencing with the 1st day of April, 2002, the Employer shall contribute to the respective Health & Welfare Funds the sum of $4.4625 per hour figured to the nearest quarter hour for which an employee covered by this Agreement receives pay up to a maximum of forty (40) hours but not more than $178.50 per week for any one (1) employee.

Commencing with the 1st day of April, 1998, and for the duration of the current collective bargaining agreement and any renewals or extensions thereof, the Employer agrees to make payments to the respective Health & Welfare Funds as follows:

(1) The Employer agrees to make contributions up to a maximum

**215**

of forty (40) hours in behalf of a regular local employee who may be on layoff status during any payroll period but has completed three (3) days of work in that payroll period.

(2) The Employer agrees to make contributions up to a maximum of forty (40) hours in behalf of a regular road driver who may be on layoff status during any payroll period but has completed two (2) tours of duty in that payroll period.

For purposes of this Article, each hour paid for or any portion thereof, figured to the nearest quarter hour, as well as hours of paid vacation, paid holidays and other hours for which pay is received by the employee shall be counted as hours for which contributions are payable.

If a regular employee is absent because of illness or off-the-job injury and notifies the Employer of such absence, the Employer shall continue to make the required contribution of 32 hours for a period of four (4) weeks. If a regular employee is injured on the job the Employer shall continue to pay the required contributions until such employee returns to work; however, such contributions of 32 hours shall not be paid for a period of more than twelve (12) months.

There shall be no deduction from equipment rental of owner-operators by virtue of the contributions made to the Health and Welfare Fund, regardless of whether the equipment rental is at the minimum rate or more, and regardless of the manner of computation of owner-driver compensation.

Hourly contributions to the Health and Welfare Fund must be made for each hour worked on each regular or extra employee, even though such employee may work only part time under the provisions of this contract, including weeks where work is performed for the Employer but not under the provisions of this contract, and although contributions may be made for those weeks into some other Health and Welfare Fund.

In the case of employees paid on a mileage basis, the numbers of hours of contribution to the Health and Welfare Fund shall be determined by dividing that employee's gross earnings for the week by the current hourly rate. Gross earnings shall include any other hours paid for, such as waiting time, breakdown time, pick-up and drop-off time, subject to the maximum weekly amount of contributions set forth above, not to exceed forty (40) hours per week per employee.

**216**

All contributions shall be made at such time and in such manner as the Trustees require, and the Trustees shall have the authority to have an independent Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Welfare Fund.

If an Employer fails to make contributions to the Welfare Fund within 72 hours after the notice of delinquency set forth in Article 46, Section 3, the Local Union shall take whatever steps are necessary to secure compliance with this Article, any provisions of this Agreement to the contrary notwithstanding, and the Employer shall be liable for all costs for collecting the payments due together with attorneys' fees and such penalties which may be assessed by the Trustees.

The Employers' liability for payment hereunder shall not be subject to the Grievance Procedure or arbitration provided under this Agreement.

(c) The Employers and Union which are signators hereto ratify the designation of the Employer and the Employee Trustees under such Agreement, and ratify all action already taken, or to be taken by such Trustees within the scope of their authority.

(d) All Employers contributing hereunder shall post each month at each terminal or other place of business where employees have easy access thereto an exact copy of the remittance report form of contributions sent to the Fund.

(e) Whenever an Employer signatory to this Agreement becomes delinquent in contributions owed to the Health and Welfare Fund and the Local Union serves a 72-hour notice of delinquency set forth in Article 46, Section 3, such Employer after satisfying the delinquency and becoming current, and then during the term of this Agreement becomes delinquent again, shall be required to post a performance bond to satisfy that second delinquency and/or any further delinquencies during the term of this Agreement.

(f) The Trustees or their designated representatives shall have the authority to audit the payroll and wage records of the Employer for all individuals performing work within the scope of and/or covered by this Agreement, for the purpose of determining the accuracy of contributions to the funds and adherence to the requirements of this Agreement regarding coverage and contributions. For purpos-

217

es of such audit, the Trustees or their designated representatives shall have access to the payroll and wage records of any individual, including owner-operators, lessors and employees of fleet owners (excluding any supervisory, managerial and/or confidential employees of the Employer) who the Trustees or their designated representatives reasonably believe may be subject to the Employer's contribution obligation.

(g) The provisions of Article 8(6)(a) of the NMFA shall not apply to Health and Welfare contributions made under the New England Supplemental Freight Agreement when a change of operations involves only Local Unions and Health and Welfare Funds solely contained within the jurisdiction of the Southern New England Supplemental Freight Agreement, providing there is reciprocity between the Funds involved.

Note: Employees covered by this agreement who were formerly represented by IBT Union Local 526 and are currently represented by IBT Union Local 251, including all new hires, shall have Health and Welfare contributions made on their behalf to the Local 251 Health and Welfare fund.

# ARTICLE 65 - PENSION FUND

This Pension Article shall supersede and prevail over any other inconsistent provisions or articles contained within this Agreement.

(a) Commencing with the 1st day of April, 1998 and for the duration of the current collective bargaining agreement and any renewals or extensions thereof, the Employer agrees to make payments to the New England Teamsters and Trucking Industry Pension Fund for each and every employee performing work within the scope of and/or covered by this collective bargaining agreement, whether such employee is a regular, probationary, temporary or casual employee, irrespective of his status as a member or nonmember of the Local Union, from the first hour of employment subject to this collective bargaining agreement as follows:

For each hour or portion thereof, figured to the nearest quarter hour for which an employee receives pay or for which pay is due the Employer shall make a contribution of $3.46 per hour to the New England Teamsters and Trucking Industry Pension Fund but not

more than $138.40 per week for any one employee from the first hour of employment in such week.

Commencing with the 1st day of April, 1999, the said hourly contribution rate shall be $3.76 but not more than $150.40 per week for any one (1) employee; and,

Commencing with the 1st day of April, 2000, the said hourly contribution rate shall be $3.91 but not more than $156.40 per week for any one (1) employee.

Commencing with the 1st day of April 2001, the said hourly contribution rate shall be $4.06 but not more than $162.40 per week for any one (1) employee.

Commencing with the 1st day of April 2002, the said hourly contribution rate shall be $4.21 but not more than $168.40 per week for any one (1) employee.

Commencing with the 1st day of April, 1998, and for the duration of the current collective bargaining agreement and any renewals or extensions thereof, the Employer agrees to make payments to the New England Teamsters and Trucking Industry Pension Fund as follows:

(1) The Employer agrees to make contributions up to a maximum of forty (40) hours in behalf of a regular local employee who may be on layoff status during any payroll period but has completed three (3) days of work in that payroll period.

(2) The Employer agrees to make contributions up to a maximum of forty (40) hours in behalf of a regular road driver who may be on layoff status during any payroll period but has completed two (2) tours of duty in that payroll period.

For purposes of this Article, each hour for which wages are paid or due, or any portion thereof, figured to the nearest quarter hour, as well as hours of paid vacation, paid holidays and other hours for which pay is due or received by the employee, shall be counted as hours for which contributions are payable. In computing the maximum amount due any week, there shall be no daily limit on the number of hours for any one day in such week, whether such hours are performed on straight time or overtime rates, but payments shall be made at the amount set forth above.

In the case of employees paid on a mileage basis, the number of

**219**

hours of contribution to the Pension Fund shall be determined by dividing that employee's gross earnings for the week by the current hourly rate. Gross earnings shall include any other hours paid for, such as waiting time, breakdown time, pick-up and drop-off time, subject to the maximum weekly amount of contributions set forth above, not to exceed forty (40) hours per week per employee.

If a regular employee (as defined in the collective bargaining agreement) is absent because of illness or off-the-job injury and notifies the Employer of such absence, the Employer shall continue to make the required contributions for a period of four (4) weeks, for forty (40) hours per week. If a regular employee is injured on the job, the Employer shall continue to pay the required contributions at the rate of forty (40) hours for each such week until the employee returns to work; however, such contributions of forty (40) hours shall not be paid for a period of more than twelve (12) months.

(b) The Employer agrees to and has executed a copy of the New England Teamsters and Trucking Industry Pension Fund Agreement and Declaration of Trust dated April 11, 1958, and accepts such Agreement and Declaration of Trust, as amended, and ratifies the selection of the Employer Trustees now or hereafter serving as such, and all action heretofore or hereafter taken by them within the scope of their authority under such Agreement and Declaration of Trust.

(c) The parties agree that the Pension Plan adopted by the Trustees of the New England Teamsters and Trucking Industry Pension Fund shall at all times conform to the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat its contributions made to the Fund as a deduction for income tax purposes.

(d) It is also agreed that all contributions shall be made at such time and in such manner as the Trustees shall reasonably require; and the Trustees shall have the authority to have an audit of the payroll and wage records of the Employer for all employees performing work within the scope and/or covered by this collective bargaining agreement for the purpose of determining the accuracy of contributions to the Pension Fund and adherence to the requirements of this Article of the collective bargaining agreement regarding coverage and contributions, such audit may, at the option of the Trustees, be conducted by an independent certified public accoun-

**220**

tant or a certified public accountant employed by the New England Teamsters and Trucking Industry Pension Fund.

If the Employer shall fail to make contributions to the Pension Fund by the twentieth (20th) day of the month following the month during which the employees performed work or received pay or were due pay within the scope of this collective bargaining agreement, up to and including the last completed payroll period in the month for which contributions must be paid, or if the Employer, having been notified that its contributions to the Fund have been under reported and/or underpaid, fails within twenty (20) days after such notification to make any required self-audit and/or contributions found to be due, the Local Union shall have the right after an appropriate 72-hour notice to the Employer, to take whatever steps it deems necessary to secure compliance with this agreement, any provision of this collective bargaining agreement to the contrary notwithstanding, and the Employer shall be responsible to the employees for losses resulting therefrom. Also, the Employer shall be liable to the Trustees for all costs of collecting the payments due together with attorneys' fees and such interest, liquidated damages or penalties which the Trustees may assess or establish in their discretion. The Employer's liability for payment hereunder shall not be subject to the grievance procedure and/or arbitration if such is provided in this Agreement.

It is understood and agreed that once a payment or payments are referred to an attorney for collection by the Trustees of the New England Teamsters and Trucking Industry Pension Fund and/or the Local Union, the Local Union and its business agents or chief executive officer shall have no right to modify, reduce or forgive the Employer with respect to its liability for unpaid contributions, interest, liquidated damages or penalty as may be established or assessed by the Trustees in their discretion against delinquent Employers.

(e) There shall be no deduction for equipment rental of owner-operators by virtue of the contributions made to the Pension Fund, regardless of whether the equipment rental is at the minimum rate or more, and regardless of the manner of computation of owner-driver compensations.

(f) Contributions to the Pension Fund must be made for each week on each regular or extra employee, even though such employee may work only part time under the provisions of this contract, includ-

**221**

ing weeks where work is performed for the Employer but not under the provisions of this contract, and, although contributions may be made for those weeks into some other Pension Fund.

(g) No oral or written modification of this Article regarding pensions and retirement shall be made by the Local Union or the Employer and, if made, such modification shall not be binding upon the employees performing work within the scope of this collective bargaining agreement and covered by this Article or upon the Trustees of the New England Teamsters and Trucking Industry Pension Fund.

(h) All Employers contributing hereunder shall post each month at each terminal or other place of business where employees have easy access thereto an exact copy of the remittance report form of contributions sent to the Fund.

(i) Whenever an Employer signatory to this Agreement becomes delinquent in contributions owed to the Pension Fund and the Local Union serves a 72-hour notice of delinquency set forth in Article 46, Section 3, such Employer after satisfying the delinquency and becoming current, and then during the term of this Agreement becomes delinquent again, shall be required to post a performance bond to satisfy that second delinquency and/or any further delinquencies during the term of this Agreement.

(j) The Trustees or their designated representatives shall have the authority to audit the payroll and wage records of the Employer for all individuals performing work within the scope of and/or covered by this Agreement, for the purpose of determining the accuracy of contributions to the funds and adherence to the requirements of this Agreement regarding coverage and contributions. For purposes of such audit, the Trustees or their designated representatives shall have access to the payroll and wage records of any individual, including owner-operators, lessors and employees of fleet owners (excluding any supervisory, managerial and/or confidential employees of the Employer) who the Trustees or their designated representatives reasonably believe may be subject to the Employer's contribution obligation.

**222**

## ARTICLE 66 - AUTOMATIC INCREASES

The provision of Article 61 (Overhead Operations), Article 62 (Two-Man Operations) and Article 63 (Owner-Operators) shall be automatically amended to incorporate whatever amendments or changes may be made in the parallel provisions of the Central States, Over-the-Road Motor Freight Agreement for the contract period starting April 1, 1991, effective as of the dates such amendments or changes become effective under such Central States Agreement.

## ARTICLE 67 - TERMINATION CLAUSE

The term of this Supplemental Agreement shall be from April 1, 1998 to March 31, 2003.

## SOUTHERN NEW ENGLAND
## TNFINC/TMI NEGOTIATING COMMITTEE
## MEMORANDUM OF AGREEMENT

Laid off employees shall be guaranteed forty (40) hours Health, Welfare and Pension contributions in accordance with Article 64 and Article 65 of the New England Supplemental Freight Agreement, providing they are available for the next work call after having not been available for the first work call, providing all work calls are verified. In cases where work calls are received through an answering machine the Company agrees to leave a message outlining the work opportunity and time of the message. Laid off employees who refuse work will have broken their guarantee.

IN WITNESS WHEREOF the parties hereto have set their hands and seals this _____ day of _____, 1998 to be effective as of April 1, 1998 except as to those areas where it has been otherwise agreed between the parties:


NEGOTIATING COMMITTEE
*For the Local Unions:*
TEAMSTERS NATIONAL FREIGHT INDUSTRY
NEGOTIATING COMMITTEE
Thomas Sever, Chairman
Richard Nelson, Co-Chairman

| | |
|---|---|
| Thomas (Mike) Booth | Frank Busalacchi |
| Randy Cammack | Samuel M. Carter |
| George Cashman | Patrick Flynn |
| Walter A. Lytle | James Minisci |
| Ed Mireles | Donald Newton |
| Nicholas Picarello | Chuck Piscitello |
| Donald Scott | Lester Singer |
| W.C. "Willie" Smith | Theodore Uniatowski |
| Harold J. Yates | Phil Young |


NEW ENGLAND TEAMSTERS
NEGOTIATING COMMITTEE
George W. Cashman, Chairman
William Carnes, Co-Chairman

| | |
|---|---|
| Stuart Mundy, LU 251 | Anthony Buonpane, LU 443 |


*For the Employers:*
TRUCKING MANAGEMENT, INC.
Arthur H. Bunte, Jr., Chairman

| | |
|---|---|
| John Dale | Don Little |
| Stan Newman | Anthony Simoes |
| Jack Ferrone | Pete Hassler |
| Kermit Scarborough | Don Emery |
| Jim Roberts | Hal Franke |


REGIONAL CARRIERS, INC.


**224**

NEW ENGLAND EMPLOYERS
NEGOTIATING COMMITTEE
Peter Hassler, Chairman
Michael Scalzo

John Novak

Robert Mergenhagen
Robert Schaffer

**225**

IN WITNESS HEREOF the undersigned do duly execute The National Master Agreement and Supplemental Agreement (and Riders, if any) set forth herein.

FOR THE UNION LOCAL UNION No. _____, affiliate of International Brotherhood of Teamsters.

By _____
(Signed)

Its _____
(Title)

FOR THE COMPANY

_____
(Company)

By _____
(Signed)

Its _____
(Title)

Home Office Address:

_____
(Street)

_____
     (City)                                    (State)

_____
(Date Signed)

**226**

# INDEX

PAGE

ARTICLE 40 - SCOPE OF AGREEMENT ......................................164
    Section 1. Operations Covered .............................164
    Section 2. Employees Covered ..............................164
    Section 3. Notice of Opening and Closing Terminals ..........165
    Section 4. Hired or Leased Equipment ..................165
ARTICLE 41 - STEWARDS - APPOINTMENTS AND DUTIES ...165
ARTICLE 42 - ABSENCE ...........................................166
    Section 1. Time Off for Union Activities ...............166
    Section 2. Leave of Absence ...................................167
ARTICLE 43 - SENIORITY ..........................................167
    Section 1. ........................................................167
    Probationary Employees ........................................167
    Casual Employees ................................................168
    Regular Employees ...............................................169
    Section 2. Opening and/or Closing of Branches,
    Terminals, Divisions or Operations ......................172
    Section 3. "House Concerns" ...............................174
    Section 4. Loss of Seniority ...................................175
ARTICLE 44 - OTHER BUSINESS, ETC. ....................175
    Section 1. Other Business .......................................175
    Section 2. Extra Contract Agreements .................175
    Section 3. New Equipment and/or Operations ...................176
ARTICLE 45 - GRIEVANCE MACHINERY COMMITTEE ..........176
    Section 1. New England Joint Area Committee .................176
    Section 2. Eastern Region Joint Area Committee ..............176
    Section 3. Contiguous Territory ...........................177
    Section 4. Function of Committees .....................177
    Section 5. Change of Terminals, etc. ...................177
    Section 6. Attendance ...............................177
    Section 7. Examination of Records .......................177
ARTICLE 46 - GRIEVANCE MACHINERY AND
UNION LIABILITY ........................................................178
    Section 1. .........................................................178
    Section 2. .........................................................180
    Section 3. .........................................................181
    Section 4. National Grievance Committee .........................181

**227**

ARTICLE 47 - DISCHARGE AND SUSPENSION .......................181
ARTICLE 48 - PAYROLL PERIOD ....................................182
ARTICLE 49 - SUNDAYS AND HOLIDAYS ...........................183
ARTICLE 50 - VACATIONS ...........................................184
ARTICLE 51 - MISCELLANEOUS ....................................186
    Section 1. Accident Reports .......................................186
    Section 2. Court Appearances ....................................186
    Section 3. Safety Violations .......................................186
    Section 4. Bonds .................................................187
    Section 5. Examinations ..........................................187
    Section 6. Personal Identification ................................187
    Section 7. On-the-Job Claims ....................................187
    Section 8. Loss or Damage ......................................188
    Section 9. Access to Premises ...................................188
    Section 10. Injury on the Job .....................................188
    Section 11. ......................................................188
    Section 12. Other Equipment .....................................188
    Section 13. Death in Family ......................................189
    Section 14. ......................................................189
    Section 15. ......................................................189
    Section 16. ......................................................190
    Section 17. ......................................................190
    Section 18. Administrative Dues .................................190
    Section 19. Sick Leave ...........................................190
ARTICLE 52 - CLASSIFICATIONS ...................................191
ARTICLE 53 - HOURS OF WORK
AND OVERTIME ....................................................192
    Section 1. ........................................................192
    Section 2. ........................................................192
    Section 3. ........................................................192
    Section 4. ........................................................193
    Section 5. Break Bulk Terminal Operation .....................194
ARTICLE 54 - WAGES AND ALLOWANCES .........................195
ARTICLE 55 - CLASSIFICATIONS
AND TRIP RATES ..................................................197
ARTICLE 56 - MILEAGE RATES ....................................198
ARTICLE 57 - PICK-UPS, DELIVERIES AND RATE
FORMULA ..........................................................198
ARTICLE 58 - RELIEF HOLDOVER, PREMIUM PAY
& EXPENSES .......................................................199

**228**

ARTICLE 59 - DROPPING TRAILERS ..............................200
ARTICLE 60 - DOUBLE BOTTOMS ..............................201
ARTICLE 61 - OVERHEAD OPERATIONS ....................201
   Section 1. Definition ..............................................201
   Section 2. Single Man Operation Rates .....................201
   Section 3. Double Bottom Units .............................202
   Section 4. Pickup and Delivery ..............................202
   Section 5. Mileage Determination For All Runs ...............203
   Section 6. Schedule of Dispatching ..........................203
   Section 7. Lodging .............................................204
   Section 8. Paid For Time - General ..........................205
   Section 9. Call-In Time ......................................205
   Section 10. Layovers ..........................................205
   Section 11. Breakdowns or Impassable Highways ...............206
   Section 12. Deadheading ......................................207
   Section 13. Bobtailing ........................................207
   Section 14. Dropping Trailer .................................207
   Section 15. Double Bottoms ...................................208
   Section 16. ..................................................208
ARTICLE 62 - TWO-MAN OPERATION .......................208
   Section 1. Mileage Rates of Pay .............................208
   Section 2. Pickup and Delivery and Delay Time ...............208
   Section 3. ...................................................209
   Section 4. Sleeper Cab .......................................209
   Section 5. ...................................................210
   Section 6. ...................................................210
   Section 7. ...................................................211
   Section 8. ...................................................211
   Section 9. ...................................................212
   Section 10. ..................................................212
   Section 11. ..................................................213
ARTICLE 63 - OWNER-OPERATORS ..........................213
ARTICLE 64 - HEALTH AND WELFARE FUND ...............214
ARTICLE 65 - PENSION FUND ................................218
ARTICLE 66 - AUTOMATIC INCREASES .....................223
ARTICLE 67 - TERMINATION CLAUSE .......................223
SOUTHERN NEW ENGLAND
TNFINC/TMI NEGOTIATING COMMITTEE
MEMORANDUM OF AGREEMENT ..............................223

**229**

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GLENN ROUTHIER,<br><br>                   Plaintiff,<br><br>   v.<br><br>PLYMOUTH ROCK TRANSPORTATION<br>CORPORATION,<br><br>                   Defendant. | C.A. No.: 05-10856-GAO |

## AFFIDAVIT OF DAVID J. SANTEUSANIO

I, David J. Santeusanio, do hereby depose and state as follows:

1.      I am one of the attorneys representing defendant Plymouth Rock Transportation Corporation. I am submitting this affidavit in connection with Plymouth Rock Transportation Corporation's motion to dismiss pursuant to Rule 12(b)(6).

2.      Plaintiff Glenn Routhier originally filed this action in Massachusetts Superior Court in August 2004. To provide this Court some of the relevant procedural background, I have attached at Tab 1 a true and accurate copy of the civil action docket sheet for the Massachusetts Superior Court action. This civil action docket sheet was accessed and printed on July 13, 2005, from the Massachusetts Trial Court Information Center's website *www.ma-trialcourts.org.*

I state under the penalty of perjury that the foregoing is true and correct. Executed on July 19, 2005.

*/s/ David J. Santeusanio*

# 3060208_v1

# TAB 1

# Commonwealth of Massachusetts
## MIDDLESEX SUPERIOR COURT
### Case Summary
### Civil Docket

## Routhier v Plymouth Rock Transportation Corporation

Details for Docket: MICV2004-03247

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | MICV2004-03247 | **Caption:** | Routhier v Plymouth Rock Transportation Corporation |
| **Filing Date:** | 08/18/2004 | **Case Status:** | Needs status review |
| **Status Date:** | 01/05/2005 | **Session:** | Cv E (7B Cambridge) |
| **Lead Case:** | NA | **Case Type:** | Complex |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | F | **Discovery:** | 06/14/2005 |
| **Service Date:** | 11/16/2004 | **Disposition:** | 10/12/2005 |
| **Rule 15:** | 01/15/2005 | **Rule 12/19/20:** | 01/15/2005 |
| **Final PTC:** | 08/13/2005 | **Rule 56:** | 07/14/2005 |
| **Answer Date:** | 01/15/2005 | **Jury Trial:** | YES |

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | MICV2004-03247 | **Caption:** | Routhier v Plymouth Rock Transportation Corporation |
| **Filing Date:** | 08/18/2004 | **Case Status:** | Needs status review |
| **Status Date:** | 01/05/2005 | **Session:** | Cv E (7B Cambridge) |
| **Lead Case:** | NA | **Case Type:** | Employment Discrimination |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | F | **Discovery:** | 06/14/2005 |
| **Service Date:** | 11/16/2004 | **Disposition:** | 10/12/2005 |
| **Rule 15:** | 01/15/2005 | **Rule 12/19/20:** | 01/15/2005 |
| **Final PTC:** | 08/13/2005 | **Rule 56:** | 07/14/2005 |
| **Answer Date:** | 01/15/2005 | **Jury Trial:** | YES |

## Parties Involved

2 Parties Involved in Docket: MICV2004-03247

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Plymouth Rock Transportation Corporation | **First Name:** | |

| | | | |
|---|---|---|---|
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Plaintiff |
| **Last Name:** | Routhier | **First Name:** | Glenn |
| **Address:** | 12843 Brown Bark Trail | **Address:** | |
| **City:** | Clermont | **State:** | FL |
| **Zip Code:** | 34711 | **Zip Ext:** | |
| **Telephone:** | | | |

## Attorneys Involved

1 Attorneys Involved for Docket: MICV2004-03247

| | | | |
|---|---|---|---|
| **Attorney Involved:** | | **Firm Name:** | |
| **Last Name:** | Notaris | **First Name:** | Mary |
| **Address:** | 45 Stiles Road | **Address:** | Suite 104 |
| **City:** | Salem | **State:** | NH |
| **Zip Code:** | 03079 | **Zip Ext:** | |
| **Telephone:** | 603-898-6954 | **Tel Ext:** | |
| **Fascimile:** | 603-898-5210 | **Representing:** | Routhier, Glenn (Plaintiff) |

## Calendar Events

1 Calendar Events for Docket: MICV2004-03247

| No. | Event Date: | Event Time: | Calendar Event: | SES: | Event Status: |
|---|---|---|---|---|---|
| 1 | 01/20/2005 | 14:00 | Motion/Hearing: Rule12 to Dismiss | E | Event held--Under Advisement |

## Full Docket Entries

13 Docket Entries for Docket: MICV2004-03247

| Entry Date: | Paper No: | Docket Entry: |
|---|---|---|
| 08/18/2004 | 1 | Complaint & civil action cover sheet filed |
| 08/18/2004 | | Origin 1, Type B22, Track F. |

| | | |
|---|---|---|
| 11/17/2004 | 2 | Motion to File Copy in Lieu of Original |
| 11/18/2004 | | MOTION (P#2) ALLOWED (MacLeod, Justice) Notices mailed November 18, |
| 11/18/2004 | | 2004 |
| 12/06/2004 | 3 | Defendant Plymouth Rock Transportation Corporation's MOTION to |
| 12/06/2004 | 3 | Dismiss (MRCP 12b) Complaint, Memorandum in Support, Plaintiff's |
| 12/06/2004 | 3 | Objection, Memorandum in Support of Objection. |
| 01/05/2005 | | Case status changed to 'Needs status review' at service deadline |
| 01/05/2005 | | review |
| 01/20/2005 | | Re: (P#3) - No action taken as plaintiff is granted leave to remove |
| 01/20/2005 | | this case to the US District Court for District of Mass (Hines, J.) |
| 01/20/2005 | | notices sent 01/25/05 |